7. If no longer a Clark dealer, do you presently owe Clark any money? Yes _____ No _____

8. If the answer to 7 above is Yes, set forth the amount of money which you presently owe Clark. $_____

Attach hereto copies of any documents relating to any money you owe Clark.

I certify that the foregoing information is true and correct under penalty of perjury.

_____
 Signature

_____

_____
 Address

Date: _____

**UNITED STATES of America,**

v.

**Henry GOMEZ–LONDONO, Defendant.**

**No. 76 CR 153.**

United States District Court,
E. D. New York.

Nov. 17, 1976.

Jeffrey H. Kay, Asst. U.S. Atty., Brooklyn, N. Y. (David G. Trager, U.S. Atty., Brooklyn, N. Y., of counsel), for the Government.

Ivan Stephen Fisher, New York City (Jeffrey D. Ullman, New York City, of counsel), for defendant.

### MEMORANDUM and ORDER

DOOLING, District Judge.

Defendant was indicted on three counts: *first*, for having knowingly and wilfully made a materially false, fraudulent and fictitious declaration to Agents of the Customs Service, with respect to the amount of money that he was carrying on his person and in his luggage when he was preparing to board Avianca Airlines Flight No. 53 on February 22, 1976; *second* for wilfully transporting and causing to be transported via Avianca Flight No. 53 from John F. Kennedy International Airport (JFK) to Colombia, South America, $44,780. in United States currency having failed to file a report on Form 4790 as required by 31 U.S.C.

1101(b) and 31 C.F.R. §§ 103.23(a) and Section 103.25(b); and, *third*, for knowingly delivering to Avianca Flight No. 53 two 38 caliber firearms, and ammunition, for concealed transportation to Colombia, South America; to persons other than licensed importers, manufacturers, dealers or collectors without written notice to Avianca that the firearms and ammunition were being transported and without turning the firearms over to the pilot, conductor or operator of Avianca Flight 53.

The facts are few, simple and have been completely stipulated both for the purposes of defendant's motion to suppress the evidence involved and to dismiss the several counts of the indictment, and for the determination of the issue of guilt, if the motions are not granted.

On February 21, 1976, Drug Enforcement Administration agents told the United States Customs Agents that a reliable DEA informant had advised that a Henry Gomez-Londono would leave the New York area for Colombia, South America, during the period February 21, 1976, through February 25, 1976, taking with him $100,000 in United States currency to complete a narcotics transaction. The informant described Gomez-Londono as a man born October 12, 1950, and having brown hair, brown eyes, thick lips, broad nose, a square hairline, and a Colombian passport, No. 53 5124.

The Customs Agents accordingly established a surveillance at Pan American World Airlines Terminal at JFK at the Avianca Airlines departure area. Nothing came of the surveillance on that day. On the next day, February 22, 1976, the Customs Agents again established a surveillance at the Pan American Terminal at JFK at the Avianca Airlines departure area. On that day an airline employee told the Customs Agents that a Henry Gomez-Londono was presently in the Avianca Airlines area. The Agents, after observing Londono, concluded that he was the man described by the DEA informer. As Gomez-Londono walked toward the Avianca Airlines departure area, two plain-clothes Customs Agents stopped him.

Gomez-Londono had already surrendered his luggage to be checked on to the flight and had received his baggage checks. However, he had not yet checked himself in as a passenger, and he had not surrendered the coupon covering the trip from New York to Colombia. That coupon would not have been "lifted" until he reached the desk at the departure gate for Avianca Flight 53.

After Gomez-Londono was stopped, a uniformed Customs Inspector, Robert Como, was brought over; he identified himself to Londono and also identified the plainclothes Customs Agents to Gomez-Londono as Agents Healey and Annunziata. A Pan American employee acted as a Spanish interpreter at this point. In addition to the three Customs Agents and the Pan American interpreter there were in the group near Gomez-Londono another Pan American employee and two Port of New York Authority Police officers. None of the latter three persons participated in questioning or in arresting Gomez-Londono. The two police officers were those regularly assigned to the Pan American Terminal to observe departing passengers.

Upon being stopped, Gomez-Londono was advised of the provisions of 31 U.S.C. 1101(b), that is, that he was required to make a report declaring any money he was taking out of the country in excess of $5,000. He was then asked if he was taking out more than $5,000 in currency. He was asked a second time whether he had more than $5,000 and Gomez-Londono then told the Customs Agents that he had $900 in currency, and he took from his pockets and exhibited $900 in currency to the Customs Agents. After he was asked for a third time if he had more than $5,000, Gomez-Londono took an envelope from his jacket pocket and handed it to the Customs Agents saying that he did not know what was inside the envelope. The Customs Agents observed something green through an opening in the bulging envelope, and they opened the envelope and found that it contained $10,000 in $100 Federal Reserve notes together with a photograph of Londo-

no. Gomez-Londono told the Customs Agents that he had been given the envelope to deliver to Bogota, Colombia.

At that point Gomez-Londono was told that he was in custody. His airline ticket, passport and baggage claim tickets were taken from him. The luggage had already gone aboard the aircraft, but it was removed before the aircraft left the United States, and it was taken to the International Arrival Building along with Gomez-Londono. Only at this point was Londono advised—in Spanish—of his Constitutional rights, and he was then interviewed. Thereafter he was taken to the City office of the Customs Service for fingerprinting, and he was lodged at the Metropolitan Correction Center overnight. On the following morning Gomez-Londono was arraigned before the United States Magistrate.

On the next following day, February 24, one of the Special Agents of the Customs service applied to the United States Magistrate for a search warrant. The affidavit recited the facts substantially as set forth above. An added paragraph stated that a DEA Agent had advised the affiant that the Special Agent in Charge of the DEA Bogota, Colombia, office had advised the Special Agent in Charge, by telephone from Colombia, that the original informant had furnished highly reliable information in the past, but that for security reasons no further information could be supplied. The warrant sought the right to search the luggage (valise and parcels) covered by Gomez-Londono's claim checks. The warrant was executed and $44,780 in United States currency was found concealed inside various items included with the valise and cartons that Gomez-Londono had checked onto the aircraft.

■ The statute involved in the second Count of the indictment is 31 U.S.C. § 1101; it requires reports of exports of monetary instruments. 31 U.S.C. § 1058 makes wilful violation of Section 1101 a misdemeanor. Both Sections are part of the Currency and Foreign Transactions Reporting Act of October 26, 1970. The avowed purpose of the Act (Section 1051) is to require certain re-

ports or records where such reports or records have a high degree of usefulness in criminal, tax or regulatory investigations or proceedings. The regulations of the Secretary of Treasury (authorized by Section 1053) give the generalized requirements of the Act precision of application. As the Supreme Court noted in *California Bankers Assn. v. Shultz*, 1974, 416 U.S. 21, 26, 94 S.Ct. 1494, 1500, 39 L.Ed.2d 812,

> ". . . the Act's civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone."

Section 1101 of the Act provides (with immaterial exceptions) that whoever knowingly transports, or causes to be transported, monetary instruments from any place in the United States to any place outside it in an amount exceeding $5,000 on any one occasion shall file a report. The reports required are to be filed at such times and places, are to be in such form and detail as the Secretary requires, and may be required to contain the amounts and the types of monetary instruments transported. A printed form, Form 4790, has been established by the Treasury Department which is headed "Report of International Transportation of Currency or Monetary Instruments." It requires a good deal of personal detail as to passport, etc., and requires a detailed statement of the coins, currency, and instruments being transported.

The statute itself does not prescribe the time and place for filing the reports. However, 31 CFR § 103.23 provides that each person who physically transports currency in excess of $5,000 on any one occasion from the United States to a place outside it must make a report. Section 103.25 of 31 CFR § 103.25 provides further:

> "Reports required to be filed by § 103.-23(a) shall be filed at the time of . . departure, mailing or shipping from the United States, unless otherwise directed or permitted by the Commissioner of Customs. They shall be filed with the Customs Officer in charge at any Customs

port of entry or departure, or as otherwise permitted or directed by the Commissioner of Customs. If the currency or other monetary instruments with respect to which a report is required do not accompany a person . . . departing from the United States, such reports may be filed by mail on or before the date of . . . departure, mailing or shipping, with the Commissioner of Customs . . . . They shall be on forms to be prescribed by the Secretary and all information called for in such forms shall be furnished."

When the plain-clothes Customs Agents approached Gomez-Londono at the airport, they did not tender to him a Form 4790. It is neither stipulated nor asserted that the Customs Agents explained to Gomez-Londono that—disregarding any possible illicit source of the money—neither his possession of the money nor his exporting it was forbidden by law, and that he was free to leave with whatever money he had so long as he made a report on Form 4790. He was not given any *Miranda* advice; no offense had been committed and no agent of government at that time had reasonable ground for believing that Gomez-Londono had committed any offense for which he could have been arrested. Whether there would be an offense depended on what Londono said and did after the agents stopped him.

■ In connection with the discussion of the applicability of *Miranda v. Arizona*, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, counsel have discussed the question of arrest and custody. Gomez-Londono was plainly not under arrest. It is not possible to say on the facts that he would or could have been restrained of his liberty if he had declined to speak, had withdrawn from his projected trip, or had made a correct declaration of the currency which was on his person and in his luggage.

Gomez-Londono was menaced by numbers, no doubt. That may have affected his willingness to speak, an effect similar to that produced upon willingness of utterance in *Miranda* circumstances. But the case is

one not of the custodial interrogation of one who is in the focus of investigation and at the point of accusation. It is a noncustodial interrogation, but that is not the end of the issue. The Court has said (*Beckwith v. United States*, 1976, 425 U.S. 341, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1):

> "We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . .' *Rogers v. Richmond*, 365 U.S. 534, 544, [81 S.Ct. 735, 741, 5 L.Ed.2d 760, 768] (1961). When such a claim is raised, it is the duty of an appellate court . . . 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.' (Citation omitted). Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive."

The question is the due process question of fairness, but it suggests as a parallel the fairness question that underlies the right to complain of interrogation directed to eliciting self-accusatory admissions. The approach that seeks to elicit words that are then charged as a crime must surely, as in the case of custodial interrogation, be manifestly fair.

It is, generally speaking, plain enough that (as the Court put it in *Bryson v. United States,* 1969, 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264)

> "Our legal system provides methods for challenging Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and wilfully answer with a falsehood." (Footnote numeral omitted.)

And in *Bryson* the Court sustained a conviction for the filing with a Government agency of a false affidavit under a statute of questionable validity, holding that, even had the claim of invalidity been sustained, it would not have excused the filing of the false affidavit. (The charge in *Bryson* was under 18 U.S.C. § 1001.)

No such legal dilemma was presented to Gomez-Londono by the question put to him. A truthful answer would have exposed him to nothing except the obligation to fill out a Form 4790 correctly. He would then have been free to leave the country with the money.

■ It has been suggested that merely to ask a man whether he had more than $5,000 in his possession required him to furnish in answer information which, added to other facts, might have made out some criminal responsibility on his part, that he should have been given the *Miranda* warning because an admission that he possessed so much money, or was taking it to Colombia, could implicate him in criminal charges. The argument must be rejected. No facts are referred to and none can readily be conjectured which could support the contention. *United States v. Mandujano,* 1976, 425 U.S. 564, 96 S.Ct. 1768, 1776–1777, 48 L.Ed.2d 212 echoing *Bryson* is clear that where there is a duty to answer, there is no privilege to lie, and, in the present case, there was an unqualified duty to answer a fairly put inquiry and a duty to answer it truthfully. See *United States v. Chevoor,* 1st Cir. 1975, 526 F.2d 178, 182, 185.

The questions that remain, however, turn around the sufficiency of the Second Count and whether the First Count is fairly within the principle of the cases just referred to in the special circumstances of the interrogation in this case.

■ It is difficult to see on what basis it can be claimed that there was here a violation of Section 1101(b) of the Act. Count Two does allege that Gomez-Londono wilfully transported or caused to be transported $44,780 of United States Currency to Colombia without first filing a report. But that allegation is not intended to indicate that in fact any money ever left this country for, treating the stipulated facts as

equivalent to a response to a request for particulars (a stage cut through in the present case), it is clear that the Government's position, and what Count Two charges, is that Gomez-Londono had done enough in committing the luggage to International transport by Avianca to become guilty of a violation of Section 1101(b) when, before he had himself boarded the plane or indeed surrendered his passage coupon, he made a false statement to the inquiring Customs Agents about how much money he intended to take abroad. But Londono's duty to have filed the report accrued under 31 CFR § 103.25(b) not earlier than "the time of departure." Gomez-Londono never departed the United States, nor was the money ever transported from the United States. Gomez-Londono is not charged with an attempt to violate Section 1101(b) within the meaning of Section 1058, nor does the statute punish attempts. His acts at most constituted a frustrated attempt. *Cf. United States v. San Juan,* 2d Cir. 1976, 545 F.2d 314.

It may be suggested that the statute would be defeated of its purpose if liability did not attach until the moment of departure. That does not appear from the facts of the present case, nor does it appear as a likely consequence in general of a reading of the statute and the regulations which confines them to the plain meaning of the words used. In this case nothing would have prevented the officers from delaying their intervention until Gomez-Londono had been tendered and had filled out a false Form 4790 and then had surrendered his passage coupon, had received his boarding pass, and was ready to board, or had taken his place in the aircraft. The purpose of the Act is not to garner transgressions but to secure disclosure of the currency movements and the identities of those bringing them about.

 Count One, framed under 18 U.S.C. 1001, presents different questions. It is easy to say that this is not an entrapment as entrapment is today defined. *Hampton v. United States,* 1976, 425 U.S. 484, 491, 495, 498, 96 S.Ct. 1646, 1650, 1652,

1654, 48 L.Ed.2d 113 and it is not necessary to plunge into the theoretical difficulties with reading Section 1001 as inapplicable to the case in which the Government initiates the inquiry that elicits the response that is made the subject matter of an indictment under Section 1001. See *United States v. Chevoor, supra,* 526 F.2d at 183 and footnote 10; *United States v. Adler,* 2d Cir. 1967, 380 F.2d 917, 922. It is not even certain under Section 1001 that a statement must be a material one, although in the present case the statement relied upon was certainly material to the point involved. And it is accepted Section 1001 lore that reliance upon the statement by the Government need not be shown. While the statute, then, is formidable in its scope and severity, it must in each instance of its application derive the substance of its prohibition from the circumstances in which the statement is used. The statute here underlying Section 1001, 31 U.S.C. 1101(b), is not one concerned with oral statements to investigators, but with written reports on the international transportation of monetary instruments.

 For the Government to indict Gomez-Londono for the false answer to the oral interrogation it must show that the interrogation was fair in the circumstances in which it was undertaken and in the light of the purpose of the statute which authorized the inquiry and required the answer. What was done simply elicited a defensive reaction to the exigency of unexpected official questioning of a person whose threshold of apprehension was necessarily, on the Government's information about his situation, a very low one indeed. Gomez-Londono should have been tendered a Form 4790 and have been told that he was free to take as much United States currency out of the country as he wished, but that he was obliged to report the amount that he was taking, and would then be free to depart with all of the money that he declared. So much was necessary to secure compliance with the Act and to elicit a response on which the Government could proceed with propriety. Gomez-Londono was not a ward

of the Government, but when the Government undertakes to interrogate a man in the knowledge that if he gives a truthful answer it will be wholly beneficial to him, and if he gives an untruthful answer he may commit two crimes, due process of law requires that the interrogation be such that the expected or probable result is compliance with law and not the eliciting of a violation of law.

The episode at JFK does not appear as one in which the Government sought information for a statutory purpose in order to secure compliance with the law and was disappointed in its expectation of a candid response.

The result of the transactions at JFK on February 22d was, then, that the offense of Section 1001 was not committed. As in the case of Count Two, the stipulation of facts taken as a particularization of Count One establishes its insufficiency to charge the offense of Section 1001.

Count Three charges a very clear-cut violation of 18 U.S.C. 922(e) which makes it unlawful for anyone knowingly to deliver to any common carrier for transportation in foreign commerce to persons other than licensed importers, manufacturers, dealers or collectors any package in which there is any firearm or ammunition without written notice to the carrier that the firearm or ammunition is being transported or, in the case of the legal possessor of a firearm, without delivering the firearm and ammunition into the custody of the pilot or captain of the common carrier for the duration of the trip. Whether Count Three can stand therefore depends wholly on the validity of the search under the warrant.

█ The affidavit in support of the warrant of attachment is far more complete than is usually the case, and it cannot but have persuaded the Magistrate that the occasion was a most proper one for the issuance of a warrant. No one was before the Magistrate to suggest the legal problems related to prosecutorial conduct which the very completeness of the affidavit might have disclosed to the Magistrate. To say therefore that he acted indiscreetly in granting the warrant is impossible. Nevertheless, having reached the foregoing conclusion as to the nature of the defects in Counts One and Two of the indictment, it necessarily follows that, practically helpless as the Magistrate was to reach the point determined in this Court, the nature of law requires the conclusion that the affidavit supporting the warrant was insufficient in law. In consequence the defendant's motion to suppress must be granted.

It is accordingly

ORDERED that defendant's motion to suppress defendant's statements of February 22, 1976, and the physical evidence obtained from the person of defendant and upon the execution of the warrant of attachment is in all respects granted.