**UNITED STATES of America, Appellee,**

v.

**Nathaniel A. SHANKS, Appellant.**

**No. 264, Docket 79–1244.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1979.
Decided Oct. 18, 1979.

Theodore Krieger, New York City, for appellant.

Sara E. Steinbock, Asst. U. S. Atty., S. D. New York, New York City (Robert B. Fiske, Jr., U. S. Atty., and Howard W. Goldstein, Asst. U. S. Atty., S. D. New York, New York City, of counsel), for appellee.

Before GURFEIN, VAN GRAAFEILAND and KEARSE, Circuit Judges.

PER CURIAM:

Nathaniel Shanks was convicted of making false statements to the Secret Service in violation of 18 U.S.C. § 1001. The false statements were made in connection with a Secret Service investigation of an alleged robbery reported by Shanks.

On December 20, 1978 Shanks, then an employee of the Small Business Administra-tion [SBA], picked up an envelope at the United States Post Office, 90 Church Street, New York, New York. The envelope was addressed to the SBA and contained $275,000 in government checks. Shanks returned to his office but failed to deliver the checks to the SBA. During the next eight days, Shanks, after reporting a robbery, gave seven explanations as to the disappearance of the envelope, including the false statements to the Secret Service that are the basis for this conviction.

Shanks' first version of the events of December 20, 1978 was that the envelope and some of his jewelry were taken from him at gunpoint by two unknown robbers. He related this version of the events to the New York City Police Department and then, when the Police Department requested the assistance of the Secret Service, to Secret Service Agent Sullivan.

During the next few days, Shanks, upon further questioning by Agent Sullivan, changed his story many times. He stated that the robbery story was a fabrication and that, in fact, he had been "conned" out of the checks by a man and woman whom he did not know. After further questioning, Shanks then stated that he had opened the envelope in the presence of the unknown man and woman, that the man had offered him $2,000 for the checks, and that Shanks gave the checks to the man, who promised to meet him that evening and turn over the money.

In the next version of the story, Shanks reported that he *did* know the woman and the man, that the woman was the mother of his first child and the man was her boyfriend, and that Shanks had given the two the checks in return for a promise of $2,000. Shanks wrote, signed and swore to a statement that this version was true.

The next morning, however, Shanks returned to the Secret Service office, stated that his previous accounts of the events of December 20th were untrue, and signed a sworn statement that he had actually given the checks to Sanchez, a co-worker at SBA, who had offered to dispose of the checks and to give Shanks 15% of their face value.

It is for making this statement that Shanks was convicted.

Shanks agreed to cooperate with the Secret Service by engaging Sanchez in a conversation about the checks while wearing a recorder and transmitting device. In the recorded conversation, Sanchez seemed to make inculpatory statements, and on December 27 Agent Sullivan swore to a complaint against both Sanchez and Shanks.

Sanchez was arrested, but denied any involvement in the theft and asserted that during the recorded conversation he had been reading from a script prepared by Shanks. This assertion was corroborated, at the Shanks trial, by an amplification of the recording, which revealed whispered queries by Sanchez which indicated that it was not a spontaneous, unrehearsed conversation.

On December 28 Shanks admitted that the Sanchez story was a set-up, and offered two more versions of the events of the 20th: that he had burned the checks and that he had cooperated with a co-worker other than Sanchez in taking the checks. At trial, Shanks admitted that six of the seven stories told to the Secret Service were false and claimed that the "con" story was the only true account.

■ Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or en-

try, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The section is designed "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941). In *United States v. Adler,* this Court held that F.B.I. investigations were "matter[s] within the jurisdiction of any department or agency of the United States" for purposes of § 1001 and that "[t]he making of intentionally false statements to the F.B.I. calculated to provoke an investigation by that agency" violated the statute. 380 F.2d 917, 922 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967).

■ Shanks' signed and sworn false statement accusing Sanchez of involvement in the theft of the government checks fits squarely within the scope of *Adler* and clearly violates § 1001. The appellant notes that other courts have expressed concern that in the absence of procedural safeguards and a requirement of materiality § 1001 could well "undermine the safeguards that are normally provided in perjury prosecutions . . . while permitting sanctions as great as those under perjury statutes." *See United States v. Chevoor,* 526 F.2d 178, 183 (1st Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); *United States v. Ehrlichman,* 379 F.Supp. 291, 292 (D.D.C.1974).[1]

Even if this Circuit were to share these concerns, or to adopt a limitation on § 1001 with respect to allegedly false statements that are mere "exculpatory denials"[2] there

---

1. In *Ehrlichman,* the court's major concern was with the absence of any transcript or written record of the proceedings giving rise to the allegedly false statement. The court suggested that the "literal truth" test of *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), should not be limited to perjury cases, and should be applied to § 1001 prosecutions as well, but that in the absence of a transcript it would be almost impossible to ascertain whether the allegedly false statement

was "literally true" even if technically false. 379 F.Supp. at 292. Of course we face no such problem in this case. It is conceded that the "Sanchez statement" is false, and the statement is contained in a signed, verified writing.

2. *See, e. g., United States v. Chevoor,* 526 F.2d 178 (1st Cir. 1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). *But see United States v. Adler,* 380 F.2d 917, 922 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967).

would be no basis for reversing the conviction in this case. During the questioning by the Secret Service agent, Shanks was advised of his constitutional rights several times and was also told of the penalties for perjury. The statement as to Sanchez' involvement can in no way be characterized as a mere "exculpatory denial," [3] and it was signed and verified. There is no question that the statement was a deliberate falsehood which succeeded, although fortunately only for a short time, in shifting the focus of the Secret Service investigation to Sanchez, who was innocent. In sum, Shanks' signed sworn statement to the Secret Service was a clear attempt to "perver[t]" the operation of a government agency in violation of § 1001.

The judgment is affirmed.

---

**3.** This Court made a similar observation with respect to the statement involved in *United States v. Adler, supra,* 380 F.2d at 922.