UNITED STATES of America,

v.

Francesco CUTAIA and Vittorio Mirabili, Defendants.

No. 80 CR 653.

United States District Court, E. D. New York.

April 9, 1981.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y. (Thomas G. Roth, Asst. U. S.

Atty., Brooklyn, N. Y., of counsel), for plaintiff.

Segal & Hundley, New York City (Marvin V. Segal, New York City, of counsel), for defendant Cutaia.

Guy L. Heineman, New York City, for defendant Mirabili.

MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendants Francesco Cutaia and Vittorio Mirabili move to dismiss each count of a three-count superseding indictment on the ground that the statutory provisions charged do not apply to the conduct alleged, and to suppress all statements by defendants and all evidence seized through searches of their persons or property, on the ground that the statements and evidence were obtained in violation of defendants' rights under the Fourth and Fifth Amendments.

Count One charges that defendants violated 18 U.S.C. § 1001 by falsely stating to an official of the Customs Service that they were not taking in excess of five thousand dollars out of the United States although they were in fact taking $435,000. Count Three charges that they violated 31 U.S.C. §§ 1058 and 1101 by transporting or causing to be transported approximately $435,000 from the United States without filing a report with the Customs Service at the time of their departure. Count Two charges a conspiracy to commit the crime charged in Count Three.

The counts of the indictment are sufficient on their face. However, defendants have waived a jury trial, and in order to determine the suppression question the court was required to decide the critical issues bearing on the merits of the prosecution. Most, if not all, the evidence which would·be adduced at trial was developed at the suppression hearing, and hence the court determines the sufficiency of that evidence to sustain the charges.

The evidence established the following facts.

On November 25 and 26, 1980, agents of the Drug Enforcement Administration (DEA) observed Cutaia and Mirabili in the vicinity of the New York Sheraton Hotel in Manhattan in the company of a person later identified as Domenico Cefalu. On the morning of November 27, 1970 Cutaia and Mirabili, who had been occupying the same room at the hotel, checked out, and went to the Howard Johnson's Hotel at John F. Kennedy Airport, registering at about 1:00 P.M. in Room 518.

At about 5:40 P.M. of the same day, Cefalu came to the Howard Johnson's Hotel, took two burgundy colored suitcases from the trunk of the car in which he arrived, and registered in Room 621. He asked the clerk for the room number of Cutaia and Mirabili. At about 6:00 P.M. they came to Cefalu's room, stayed about twenty five minutes, and then left.

At about 7:50 P.M. Cutaia and Mirabili left the hotel in one of the hotel vans and went to the TWA terminal where both presented tickets and booked flight on TWA Flight 880 to Athens, Greece, scheduled to leave at 6:30 P.M. the following evening, November 28, 1980. The agent gave them seat assignments and boarding passes. Cutaia asked the procedure for checking baggage, and the agent explained that a passenger can check baggage as early as six hours before departure. Cutaia replied that that was good as they wished to check their baggage before flight time and do some shopping or business in the city. The conversation was carried on in a mixture of English, Spanish and Italian. Defendants then returned to the Howard Johnson's Hotel at about 9:30 P.M.

At about 10:00 P.M. Cutaia went back to Cefalu's room 621, and did not leave until some time after 2:00 A.M. the next morning, November 28, 1980. At about 10:30 A.M. of that morning Cutaia returned to Cefalu's room and stayed about one half hour. At about 2:30 P.M. Cefalu left the room carrying the two burgundy colored suitcases and an attache case. He went by cab to the TWA terminal of the airport. There he gave the bags to a skycap who

tagged them for flight 880 departing at 6:30 P.M. and put them on a conveyor belt to be taken to the basement of the terminal. In order to check the bags with the skycap, Cefalu was required to have a ticket for the flight. The court finds that he presented Cutaia's ticket to the skycap. After he gave the bags to the skycap Cefalu remained in the area of the terminal.

At about 3:00 P.M. Cutaia and Mirabili left their room at the hotel with about eight pieces of baggage, checked out, and proceeded by the hotel's van to the TWA terminal. On the sidewalk they approached a skycap who asked them in English if they were going to check their bags. Cutaia responded in the affirmative, and the skycap asked for their tickets. Mirabili handed over his ticket. The skycap then asked Cutaia for his ticket. Cutaia stated that he did not have one and that only Mirabili was going to travel. The skycap then said that there were too many bags to be checked on one ticket, and that if they wished to check all the bags an extra tariff would have to be paid. Cutaia said that that would present no problem and that they would take care of it. Both the skycap and Cutaia talked English. The skycap then tagged two of the bags, and both defendants went with the other bags into the terminal where they made arrangements to make extra payment.

Defendants then went to the coffee shop in the terminal and sat down. Cefalu, with his attache case, was seated some seats away from them. After a few minutes he came over, sat down with defendants for a few minutes, and engaged in conversation with them. It must have been at that time that Cefalu returned Cutaia's ticket to him. Cefalu then left the coffee shop and went down to the main waiting room and watched the board on which information as to the flights was displayed. After a while defendants came to the same waiting room but did not sit down with Cefalu. He left the terminal a few minutes after 4:00 P.M. At about 5:25 P.M. defendants left the main waiting room, went through the security check point, and proceeded out the tunnel to a seating area adjacent to the gate from which flight 880 to Athens was scheduled to depart.

In the meantime agents of the DEA and customs officials had gone to the basement and taken the two burgundy colored bags to a conference room. There a customs agent opened them and discovered a few clothes on top of stacks of United States currency, to a total of $435,000.

At about 6:00 P.M. a customs inspector, Daniel S. McDonald, on instructions, went to the departure area where defendants were sitting. He announced to those seated there that as a customs inspector he would be asking them questions and giving them information pertaining to their flight. He then commenced to interview various people present. After talking to a few others in the vicinity of defendants he approached them, introduced himself, informed them that when leaving the United States with currency or monetary instruments of more than $5000 they were required by law to fill out a certain customs form, and showed them form 4790. Mirabili responded "no comprende". McDonald again went through the same information slowly in English and received the same response from both Cutaia and Mirabili.

At McDonald's request another customs official sought out someone in the terminal who spoke Italian and returned with a man named Doda Micakovic, who was waiting for a TWA flight to Detroit, Michigan, and had told the official he spoke "a little bit" of Italian. He was a Yugoslav native but had worked as a construction worker in Italy from October 1971 through December of 1972. While in Italy he spoke Italian every day, and he considered that after two or three months he spoke "pretty good Italian."

Micakovic then, translating for McDonald, asked defendants, purportedly in Italian, how much money they were carrying and stated that if they were carrying more than $5000 they had to sign the paper displayed by McDonald. Cutaia responded that he had $800 and put his hand into his pocket as if to show the money. McDonald

said "no" and motioned to him not to show anything. Mirabili then said he had $600.

Plainly Micakovic's Italian was not fluent, but both defendants understood that they were being asked whether they were taking more than $5000 with them and told that if they were doing so they were required to sign the customs form.

Defendants were then placed under arrest for violation of the currency laws. Both had tickets and boarding passes. Two claim tags, with numbers matching those on the handles of the two burgundy bags, were found in Cutaia's left boot. The keys to the two bags were found in Mirabili's pants pocket. In a shoulder bag carried by Mirabili there was a customs brochure in Italian entitled "Customs Information—U.S.A.— for the Visitor", which recited, among other things: "If you carry more than $5000 dollars in or out of the United States in currency (be it American or foreign money), in the form of negotiable checks payable to the bearer or travelers' checks, a written declaration of such a sum must be presented to the U.S. Customs at the arrival or departure. A form will be given to you for such purpose."

On entering the United States on November 20, 1980, the defendants each filled out a customs declaration form which included, among other things, the following: "Are you or any member of your family carrying over $5000.00 (or the equivalent of said amount in foreign currency) in monetary instruments such as coins, paper money, traveler's checks, money orders, or negotiable instruments payable to the bearer? (If the answer is yes, fill out form 4790, according to law.) Note: It is not illegal to transport over $5000 in monetary instruments; however, it must be reported." (Emphasis in original.)

Prior to defendants' proceeding to the departure gate the customs officials posted notices in English at the security check point and in the vicinity of the gate. These stated in large print the filing requirement in the event that a passenger transported more than $5000 in or out of the country.

## I

The court finds that defendants understood that McDonald was asking them through Micakovic how much money they were taking out of the country, whether on their persons or in their baggage, and was telling them that if they were taking with them more than $5000 they were required to sign the form which McDonald showed them. They appreciated the significance of what was said to them not only from Micakovic's translation but from other factors as well. Mirabili had with him a brochure in Italian which spelled out the filing requirement. Persons such as defendants, obviously intent on surreptitiously exporting $435,-000, would be unlikely to overlook information in their possession bearing on the regulations pertinent to the removal of currency from the United States. Defendant Cutaia, the leader of the two, knew some English. He understood the skycap speaking in English and made himself understood. Cutaia also spoke some English with the TWA ticket agent.

Both defendants came to the United States on Alitalia Airlines, and were presumably given the customs declaration forms by Alitalia personnel equipped, if need be, to explain in Italian their meaning. Those forms were addressed to arriving travelers and referred to "carrying" of over $5000 and to the fact that it was not illegal to "transport" more. These references might well be understood to apply only to the importation and not to the exportation of money. But at least they alerted defendants to the existence of United States currency requirements. Furthermore, it is common knowledge that regulations as to the importation and exportation of currency are widespread throughout the world, a fact unlikely to have escaped the notice of those sophisticated enough to be part of the scheme revealed by the testimony.

In making the finding that defendants knew of the filing requirement the court does not rely on the fact that customs officials posted notices at the security check point and near the departure area. The proof was insufficient to establish that defendants were in a position to read them.

## II

Count one charges a violation of 18 U.S.C. § 1001, which provides, in pertinent part, that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations ..." shall be punished. The statements may be oral and unsworn. *United States v. Adler*, 380 F.2d 917 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967).

Defendants claim that they made no "false" response because they could well have understood that the customs official was asking only how much money they were carrying on their persons. As noted above, the court rejects this contention and finds that defendants appreciated that the customs official wished to know the amount of currency they were taking out of the country whether in the clothes they were wearing or in their baggage. Each defendant thus responded untruthfully.

Defendants contend that even if their words were false they did not constitute "statements" within the meaning of § 1001. The argument is that that word should not be construed literally but should be read only to refer to an affirmative statement initiated by a defendant and calculated to pervert the legitimate functions of government and not to a mere "exculpatory no." Defendants rely on a series of cases in other circuits adopting this construction. *E. g., United States v. Schnaiderman*, 568 F.2d 1208 (5th Cir. 1978) and cases cited; *United States v. Bedore*, 455 F.2d 1109 (9th Cir. 1972).

This court need not decide whether the Court of Appeals for this Circuit would accept this interpretation of § 1001. *Cf. United States v. Shanks*, 608 F.2d 73 (2d Cir. 1979), *cert. denied*, 444 U.S. 1048, 100 S.Ct. 740, 62 L.Ed.2d 736 (1980); *United States v. Pereira*, 463 F.Supp. 481 (E.D.N.Y. 1978). Defendants were advised of the need for executing an official form if they were taking with them more than $5000. Indeed, they understood that McDonald was displaying to them the very paper required. They were told by him not that it was illegal to transport in excess of $5000 but that a condition of doing so was a written declaration of the fact. The brochure in Mirabili's possession gave the same advice. Defendants thus did not merely voice an "exculpatory no." They were advised of the governmental requirement and their deliberate answers were designed to avoid compliance with that requirement. *See United States v. Schnaiderman, supra*, at 1213.

What has been said disposes also of defendants' contention that their statements were not "knowingly and willfully" false within the meaning of § 1001.

Defendants contend that in any event the interrogation was so unfair as to deny due process, citing Judge Dooling's opinion in *United States v. Gomez-Londono*, 422 F.Supp. 519, 525–26 (E.D.N.Y.1976). The argument is that the government was not at liberty to make "inquisitorial" as opposed to "administrative" inquiries for the purpose not of obtaining information about the removal of currency from the United States but of laying the basis for a criminal prosecution. Defendants' argument can hardly be based on Judge Dooling's decision. The Court of Appeals reversed his ruling on the due process point. *United States v. Gomez Londono*, 553 F.2d 805, 811 (2d Cir. 1977). Moreover, in the present case defendants were advised, as Gomez-Londono was not, of the nature of the disclosure requirements.

Defendants undoubtedly had motives other than a concern as to currency regulation for concealing their connection with the $435,000. Presumably they supposed they were engaged in activities made illegal by other laws. It is true, moreover, that the agents knew that defendants, who had taken such pains to avoid the appearance of association with the two burgundy colored suitcases containing the $435,000, would undoubtedly deny that they had more than $5000. But the reasoning of no decision of the Court of Appeals for this circuit suggests that the Due Process Clause gave

them liberty to lie. The answers to McDonald's questions, if truthful, would have supplied evidence useful in the prosecution of another crime. But it is not in itself illegal to take the $435,000 out of the United States. Therefore, the questions asked of the defendants did not trench upon their right against self-incrimination. *United States v. Dichne*, 612 F.2d 632 (2d Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980).

■ The argument that defendants' statements should be suppressed under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), is sufficiently answered by the opinions in the *Gomez-Londono* case. Defendants were not in custody. The fact that the DEA agents and customs officials suspected them, indeed expected to arrest them, did not require that the *Miranda* warnings be given. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976).

### III

Count Three charges a violation of 31 U.S.C. § 1101, which provides, in pertinent part, that anyone who "knowingly ... transports or causes to be transported monetary instruments ... from any place within the United States to or through any place outside the United States ... in an amount exceeding $5,000 on any one occasion shall file a report or reports ... at such times and places" as the Secretary of the Treasury may require. Violators are subject to criminal penalties under 31 U.S.C. § 1058.

■ To establish a violation of § 1101 the government must show that defendants had knowledge of the reporting requirement and intended to evade it. *United States v. Dichne*, supra; *United States v. San Juan*, 545 F.2d 314 (2d Cir. 1976). As noted above, the court finds that defendants did have knowledge of the need to file and that the government informed them of that need.

Defendants contend, however, that their duty to report had not yet accrued as of the time they were arrested. Section 103.25(b) of 31 C.F.R. requires a report to be "filed at the time of ... departure, mailing or shipping from the United States," unless the Commissioner of Customs otherwise directs.

■ If their denials were made "at the time of departure" defendants violated § 1101. They assert that their statements were made before the time of "departure". In *United States v. Gomez-Londono, supra,* Judge Dooling held that a defendant arrested in an airport waiting area after he had checked his baggage but before he had surrendered his ticket at the departure gate had not yet reached the time of "departure". That opinion suggested that officers should have delayed their intervention until the suspect had surrendered his passage coupon, had received his boarding pass and was ready to board, or had taken his place aboard the aircraft. *Id.* at 525.

While the Court of Appeals, in reversing the decision on other grounds, did not comment on Judge Dooling's interpretation of the word "departure", *United States v. Gomez Londono*, 553 F.2d 805, 808 n. 4 (2d Cir. 1977), subsequent decisions have cast doubt upon such a restrictive reading of the regulation. In *United States v. Ajlouny*, 629 F.2d 830 (2d Cir. 1980), the Court of Appeals upheld a conviction under 18 U.S.C. § 2314 for transportation of stolen property in foreign commerce although the goods were seized from a dock before they were loaded aboard ship. That statute provides that whoever "transports" out of the United States goods, securities or money of the value of $5000 or more shall be punished. The court held the transportation requirement satisfied "once property bound for a foreign destination arrives in a customs area" and was awaiting loading aboard its vessel. *Id.* at 837. If something is being "transported" before it is loaded on board, it would seem that one can reach time of "departure" before boarding the carrier.

Good sense suggests that the time of "departure" does not mean the moment when the aircraft leaves the landing field. By

that moment the officials would have no effective means of enforcing the statute. It is more in accord with the manifest purpose of the legislation to construe the time of "departure" as that time reasonably close to the moment of the carrier's actual departure when the passenger has manifested a definite commitment to leave the country with knowledge of the filing requirement and an intention not to file.

The court holds the time of departure had been reached for defendants by 6:00 P.M. when each, after being informed of the need to file if they were taking with them more than $5000, denied he had more. When defendants made these denials their bags had been checked, and they had obtained boarding passes. They were sitting in the departure area awaiting boarding of an airplane scheduled to depart for Athens, Greece within 30 minutes. In order to board the aircraft nothing remained for them to do except walk through the departure gate and present their tickets and boarding passes. They thus made clear their intention to leave on the flight.

The facts show that defendants violated § 1101.

█ The facts also show a conspiracy to violate § 1101, as charged in Count Two.

## IV

The evidence taken from defendants' persons and baggage was properly seized after arrest as incident to the arrest and as the product of a proper border search. *United States v. Ajlouny, supra.*

## V

The foregoing constitutes the court's findings of fact and conclusions of law.

The motion is denied in all respects. So ordered.