UNITED STATES of America, Plaintiff,

v.

$831,160.45 UNITED STATES CURRENCY, Defendant.

**Philip A. DeMassa, Valai Kraitamchitkul, Claimants.**

No. C–83–0363 JPV.

United States District Court, N.D. California.

May 6, 1985.

---

Charles B. Burch, Asst. U.S. Atty., Joseph P. Russoniello, U.S. Atty., San Francisco, Cal., for the U.S.

Robert A. Van Nest, Kathryn E. Ma, Keker & Brockett, San Francisco, Cal., for claimant Philip DeMassa.

Robert E. Carey, Jr., Carey & Carey, Palo Alto, Cal., for claimant Valai Kraitamchitkul.

## AMENDED ORDER OF FORFEITURE

VUKASIN, District Judge.

The present forfeiture action results from the seizure of a large sum of unreported currency by agents of the Department of Customs [Customs] as the money was being transported out of this country via San Francisco International Airport. The currency's possessor having died in the interim, the remaining claimants contest the constitutional propriety of both the initial seizure and the ensuing forfeiture proceding, and have now moved for summary judgment on their claims. The United States, in turn, has filed a motion for summary judgment of forfeiture. These matters came on regularly for hearing before this Court, the Honorable J.P. Vukasin, Jr., presiding. Having considered the arguments of counsel, both written and oral, and all the pleadings submitted, the Court now issues this Amended Order of Forfeiture.

### Facts

The material facts of this case are undisputed. On September 4, 1981, at shortly after one o'clock p.m., Sunthorn Kraitamchitkul, a Thai national, presented himself at the Pan American ticket counter at San Francisco International Airport [SFO] and, using a ticket which had been purchased in his name the previous August 22 in Bangkok, Thailand, registered for a Pan American Airways flight scheduled to depart for Hong Kong at 2:30, little more than one hour hence. After an examination of his international travel documents, Kraitamchitkul checked through to Hong Kong one piece of luggage and received his boarding pass. He then proceeded to the departure area, taking with him various pieces of carry-on baggage.

Prior to entering the departure gate in preparation for boarding, Kraitamchitkul was obliged to pass through a security checkpoint. For international travelers, this is located at the entrance to Pier G, the foreign departure concourse at SFO. The checkpoint consists in part of an X-ray machine used to scan passengers' baggage.

It is manned not by Customs agents, but by airport security guards, and is not a point at which one may obtain from or submit forms to Customs officials. The only Customs facility in the entire airport at that time was located at a substantial distance away from and—in the ordinary course of passenger transit—before the entrance to Pier G. There was no such facility beyond the security checkpoint.

Once having passed through the checkpoint, one may leave the concourse in only one of two ways: by doubling back through the checkpoint itself, or by boarding a flight.

Kraitamchitkul approached the security checkpoint and presented his carry-on bags for inspection. The X-ray examination disclosed the presence inside of several large dark masses. Following standard airport security policy designed to locate weapons or hazardous materials, the guards opened his baggage in order to identify the source of his obnubilation. This revealed a large amount of United States currency.

The security guards then called airport police; agents of Customs and of the Drug Enforcement Administration [DEA] were eventually summoned. Although not completely fluent in the language, Kraitamchitkul conversed intelligently with the agents in English, and Customs Inspector John Martelli ascertained that he was scheduled to depart immediately for Hong Kong without having filed the required currency report pursuant to 31 U.S.C. § 5316(a). In response to questioning by Martelli about the money, Kraitamchitkul initially stated that the sum amounted to two hundred thousand dollars. Customs agents thereupon informed Kraitamchitkul of the requirement that he report to Customs any amount in excess of five thousand dollars being transported into or out of the United States. In order that the large quantity of cash could be counted in a less public arena, Kraitamchitkul voluntarily accompanied the agents to a nearby DEA station. There he admitted that he had not two hundred, but a total of eight hundred thou-

sand dollars in his carry-on bags. A subsequent pat-down search disclosed an additional thirty-one thousand dollars on his person. In all, Kraitamchitkul was carrying with him the sum of $831,160.45.

Questioning by Customs agents elicited several statements. Kraitamchitkul first indicated that, while he was aware of the reporting requirement, he had not intended to comply with respect to the subject currency. He further informed the agents that he had entered this country the previous August 23 by way of Honolulu, Hawaii, when he claimed to have been carrying the currency's value in gold. A computer check of government records revealed that Kraitamchitkul had not in fact filed the required currency report at the time of his entry into the United States. Kraitamchitkul was then arrested and the money in his possession seized.

Kraitamchitkul immediately contacted his attorney, Philip A. DeMassa, a claimant here. Late the same evening he wrote out in Thai an instrument purporting to assign three hundred thousand dollars of the seized currency to DeMassa, allegedly as consideration for the latter's services in any prospective litigation arising out of the arrest and seizure.

Sunthorn Kraitamchitkul died on March 23, 1982, leaving as an additional claimant his widow, Valai. His death brought an end to criminal proceedings stemming from the alleged reporting violation upon his entry via Hawaii. Prior to his death, however, civil forfeiture proceedings were commenced on September 22, 1981, when the District Director of Customs in San Francisco issued a Notice of Seizure and Forfeiture. This notice advised Kraitamchitkul of his right to petition for administrative remission of the seized currency within sixty days, or to opt for prompt referral of the matter to the United States Attorney for initiation of judicial forfeiture proceedings. On October 26, 1981, DeMassa waived his client's right to the latter option, requesting instead that the matter be handled administratively. At this time the money was being held as evidence in the pending criminal trial. By letter of the same date DeMassa further indicated that he did not want Kraitamchitkul interviewed until after conclusion of the criminal proceedings.

On the following November 5, Customs attorney Carl Cammarata notified DeMassa that, as counsel for Kraitamchitkul, he needed to submit a petition for remission on behalf of his client—and, if he so chose, on his own behalf as well—and that he could elect to await the end of the criminal trial before making the submission. No petition was submitted after receipt of this letter. On June 11, 1982, Cammarata wrote to notify DeMassa that the administrative forfeiture was proceeding and that, as the criminal case had recently been dismissed due to Kraitamchitkul's death, a petition for remission should be submitted directly. On the following July 20, DeMassa submitted a "supplemental" petition, forty-one pages in length, containing numerous and varied allegations.

The case was extensively investigated over the next several months, and on January 7, 1983, the Secretary of the Treasury's designee issued a decision denying the petition for remission. A January 21, 1983, letter from DeMassa demanding prompt referral to the United States Attorney for judicial forfeiture was received on January 24, and the subject forfeiture action was filed the following day.

### Discussion

#### 1 Claimants' Motion for Summary Judgment

This motion is grounded on the theory that the government's delay in filing its proceeding for judicial forfeiture violated claimants' rights to due process of law.

The United States Supreme Court addressed virtually the identical claim in a factually similar situation in the recent case of *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) [*$8,850*], ruling that the appropriate test for determining whether delay in initiating

judicial forfeiture proceedings constituted a due process violation was furnished by the earlier case of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The *Barker* tests requires the Court to assess and consider four factors:

(1) Length of delay;

(2) Reason for the delay;

(3) The [claimant's] assertion of his right; and

(4) Prejudice to the [claimant].

*Id.*, 407 U.S. at 530, 92 S.Ct. at 2192; *$8,850, supra*, 103 S.Ct. at 2012. Applying these factors, the Court in *$8,850* determined that an eighteen month delay, although "quite significant," *id.*, did not violate due process. *Id.*, 103 S.Ct. at 2015. Two aspects of the situation in *$8,850* recommended themselves to the Court as permissible reasons for delay, i.e., the initiation and determination of a petition for remission, and the subsequent pendency of criminal proceedings. The Court endorsed the District Court's perception that the government had proceeded with "all due speed," *id.*, 103 S.Ct. at 2014. Finally, the Court relied on the claimant's failure to request initiation of judicial proceedings, and her failure to make a showing of prejudice to her ability to challenge the propriety of the forfeiture on the merits. *Id.*

In the present case the United States delayed approximately sixteen months before the commencement of judicial forfeiture proceedings. While shorter than the eighteen-month delay in *$8,850*, this period nonetheless appears quite substantial: the deprivation of funds over such a length of time, doubtless a significant burden to the rightful owner, must be well justified in order to survive a constitutional challenge. However, this first *Barker* factor—length of delay—is obviated in this case by a consideration of the second factor, the reason therefor.

The government has provided the Court with several convincing explanations for the filing delay in this case. The criminal proceeding in Honolulu, in which DeMassa vigorously defended Kraitamchitkul, was pending for the first nine of the sixteen months. Though the pendency of a criminal action does not in itself justify the delay, it is one factor among others which may be considered. *$8,850, supra*, 103 S.Ct. at 2013–2014. Depending on the outcome of the criminal case, the necessity of continuance of the civil proceedings could potentially have been nullified. This period of time, therefore, prejudiced neither the United States nor the claimants, in that the result of that trial might have eliminated the need for institution of the action now at bar. This possibility was, of course, mooted by Kraitamchitkul's death during prosecution of the criminal case.

■ The pendency of that proceeding is significant for a second reason: during those nine months DeMassa refused to allow an interview of his client concerning the seizure. In order for the Secretary of the Treasure to properly exercise the discretion accorded him by, and yet be consistent with the spirit of the forfeiture provision, the government must determine, among other things, the source of the funds, the purpose in physically transporting them, their intended disposition, the reason for the failure to report them, and any involvement of the currency in illegal activity. *Id.*, 103 S.Ct. at 2013–2014. The effective unavailability of Kraitamchitkul during the criminal proceeding could not but hobble the administrative forfeiture investigation, and *a fortiori* delayed institution of the concomitant civil action.

Even given this obstacle, the United States has presented uncontroverted affidavits attesting to its diligence in investigating this matter both during and subsequent to the criminal action. Inaugurated shortly after the September 4, 1981, arrest and seizure, the government's inquiries reached points as far afield as Bangkok, Hong Kong, and the Grand Cayman Islands. Though a dispute exists as to whether the October 26, 1981, request for administrative forfeiture acted as a petition for remission, a formal petition spanning forty-one pages was submitted the following July. An administrative investigation is inherently time-consuming, *id.*, 103 S.Ct.

at 2014, and one examining so extensive a petition must necessarily involve a prolonged period of time. The government's affidavits establish that the months following submission of the petition were spent in a thorough evaluation of the various allegations contained therein. Concurrent with this, the United States was further obliged to investigate a second petition submitted by the Kingdom of Thailand. There is no evidence to indicate that the government acted with other than due diligence in either investigation.

The third factor to be considered in the *Barker* analysis is the claimant's assertion of his right to a judicial hearing. Claimants may generally trigger the rapid filing of a forfeiture action if such is their desire. All they need do is request referral of the matter to the United States Attorney for institution of such proceedings. In the instant case, however, claimant DeMassa waived such referral in writing, requesting instead that the case be handled administratively. There is no evidence that Valai Kraitamchitkul ever sought institution of judicial forfeiture. When DeMassa finally did request judicial forfeiture, the proceedings were commenced immediately. In light of this, the present assertion of unconstitutional delay in the filing of the judicial action is somewhat ironic.

The final *Barker* factor is whether the delay has resulted in prejudice to the claimant, chiefly with regard to his ability to present a defense on the merits. In this case, claimants have asserted as prejudice the sole fact that they have been denied access to the seized currency for an extended period of time. In view of this Court's ruling that the United States was entitled to confiscate the subject currency, this argument is rendered moot, *see* discussion *infra*. In any event, they have not demonstrated that their ability to challenge forfeiture on the merits has been affected by the denial of access.

■ Thus, a review of the situation here in light of the *Barker* factors, as developed in *$8,850*, leads to the conclusion that the government's delay in filing the judicial forfeiture action has not violated claimants' due process rights. The length of the delay was substantial, but the United States diligently pursued an investigation of the matter throughout that period; the delay occurred in part because, at counsel's request, the government postponed interviewing Kraitamchitkul; claimants initially waived the right to have the judicial forfeiture proceed expeditiously, thereby accounting for at least a significant measure of delay; and there has been no showing of prejudice to claimants as a result of the delay. It is therefore the Court's opinion that claimants' motion for summary judgment must be denied.

### 2 Government's Motion for Summary Judgment

The government's second cause of action alleges that Sunthorn Kraitamchitkul attempted to transport the subject currency out of the United States without filing a customs report, a violation of 31 U.S.C. § 5316(a) [formerly § 1101(a)], which provides in pertinent part that

(a) ... a person ... shall file a report under subsection (b) of this section when the person ...

(1) transports or has transported monetary instruments of more than $5,000 at one time—

(A) from a place in the United States to or through a place outside the United States....

*Id.* The statute further provides that the subject reports shall be filed "at such time and place ... as the Secretary of the Treasury may require." *Id.* at § 5316(b). The civil penalty for failure to comply with § 5316 is detailed in 31 U.S.C. § 5317(b), which specifically provides:

(b) A monetary instrument being transported may be seized and forfeited to the United States Government when a report on the instrument under section 5316 of this title has not been filed....

These two sections provide the statutory authority upon which the government bases the instant motion for summary judgment of forfeiture.

In opposition to forfeiture, claimants set forth two arguments. These will be discussed serially.

*(A) "Time of Departure"*

Claimants' initial contention is that Kraitamchitkul had not progressed far enough toward departure to violate § 5316. Seizure and forfeiture of the currency at the security checkpoint was improper, they argue, because Kraitamchitkul could have complied with the statutory scheme by reporting the currency *after* passing through the checkpoint.

The central question here is whether Kraitamchitkul had physically proceeded far enough in his attempt to remove the currency from this country to trigger the reporting requirements of § 5316. The relevant regulation interpreting this section provides that the point of filing the report is "the time of departure from the United States." 31 C.F.R. § 103.25(b). The few cases which have construed the operative, yet admittedly ambiguous phrase "time of departure" are consistent in their endorsement of the proposition that this point may be reached well before one actually crosses the international border, and even before taking a seat on an aircraft destined for a foreign port. *See United States v. Gomez-Londono*, 553 F.2d 805 (2d Cir.1977); *United States v. Cutaia*, 511 F.Supp. 619, 624–625 (E.D.N.Y.1982). No set rule has emerged, however, for divining at what precise physical point in the departure process the nascent duty to report matures; this has been evaluated on a case-by-case basis.

In *United States v. Rojas*, 671 F.2d 159, 163 (5th Cir.1982), the Court held that the "time of departure" had been reached when, the flight having been called for boarding, the defendant stepped onto the jetport preparing to board the plane. Fearing that it might engender myriad enforcement problems, the Fifth Circuit refused to fix as the "time of departure" a latter point in time. To construe this phrase as meaning the actual boarding of the aircraft, the Court stated, "would require having a customs officer on board every international flight departing the United States...." *Id.*, 671 F.2d at 163. On the other hand, the Court declined equally to overrule the possibility that an earlier stage of the departure process might in some instances represent the critical point. *Id.*, citing *United States v. Gomez-Londono, supra*, 553 F.2d 805, 810. Rather, the Court indicated that the "time of departure" is when one "unequivocally manifest[s] an intention to leave the United States...." *Rojas, supra*, 671 F.2d at 163.

In *United States v. Cutaia, supra*, the District Court for the Eastern District of New York phrased the test somewhat differently. In that case the Court held that the critical point was attained when defendants had checked their baggage, obtained their boarding passes, and were sitting in the departure area awaiting takeoff an hour hence: all that remained was for them to walk through the departure gate and present tickets and boarding passes. In reaching this determination, the Court defined the "time of departure" as that time reasonably close to the moment of the carrier's actual departure when the passenger has manifested a definite commitment to leave the country.... *Id.*, 511 F.Supp. at 625.[1] The Ninth Circuit has cited this case with approval, *United States v. Duncan*, 693 F.2d 971 (9th Cir.1982), and the Second Circuit has implicitly applied a similar test. *Gomez-Londono, supra*. The general principle which may be gleaned from these cases is that the "time of departure" from the country is reached when one is reasonably close, both spatially and temporally, to the physical point of departure itself, and manifests a definite commitment to leave.

Considering the instant situation in light of this principle, the Court determines that Kraitamchitkul reached the "time of departure" without properly filing a cur-

---

1. The *Cutaia* definition also includes elements of knowledge of the filing requirement and an intention not to comply. *Cutaia* is a criminal case, however, and as discussed below knowledge and intent are not elements essential to a civil forfeiture action under § 5316.

rency report. This conclusion is based on the uncontroverted facts that he arrived at the last security checkpoint in advance of his departure gate without exhibiting the least intention to comply with the reporting requirement (of which he subsequently indicated he was indeed aware); that he arrived there approximately one hour before his scheduled flight; and that he had previously registered for the flight, checked his baggage, and received his boarding pass—all that thus remained for him to do was to walk to the gate, present his pass, and board the aircraft. Therefore, when Kraitamchitkul approached the security checkpoint shortly before the flight he satisfied the requirements of proximity in space and time and this—in conjunction with his seeming determination to leave the United States—situated him at the "time of departure." Inasmuch as he reached this point without having filed a currency report, the Court concludes that Kraitamchitkul violated 31 U.S.C. § 5316.

### (B) Kraitamchitkul's Actual Knowledge of the Reporting Requirement

Claimants' other argument is that scienter is an element which must be established in a civil forfeiture proceeding under § 5317, and that because Kraitamchitkul was unaware of the reporting requirement the government's motion should be denied. This argument is both factually and legally unmeritorious. Based on affidavits submitted by the United States, the Court is satisfied that Kraitamchitkul was conversant in English and that he stated to agents in that language that he indeed knew of the currency reporting requirement. While claimants' opposing affidavits impugn Kraitamchitkul's fluency they are insufficient to disturb the Court's finding: it was unnecessary for Kraitamchitkul to have been endowed with a flawless command of idiomatic English in order to acknowledge his awareness of the relevant Customs requirements.

The Court makes the further determination that scienter is *not*, as claimants contend, an essential element of a civil forfeiture proceeding. The term "knowingly" in § 5316 refers only to the knowing transportation of currency, not to specific knowledge of the reporting requirements. *United States v. $4,255,625.29*, 528 F.Supp. 969, 971–972 (S.D.Fla.1981); *see also One Lot Emerald Cut Stones and One Ring v. United States*, 409 U.S. 232, 234, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972) (forfeiture action under a similar statute, 19 U.S.C. § 1497, required no proof of knowledge of reporting requirement.) Claimants' theory must therefore be rejected. Since scienter is not required, what Kraitamchitkul actually knew of the Customs requirement is irrelevant. Even were the theory advanced by claimants accepted, that he did know of the requirement indicates with even greater force the existence of a violation of § 5316.

In accordance with the above discussion, the Court has determined that summary judgment on the second cause of action must be granted in favor of the United States.[2]

### Conclusion

In consideration of the foregoing, and for good cause shown, the currency is hereby adjudged forfeited.

SO ORDERED.

---

**2.** Given this disposition, the Court need not rule on the question of the validity of the assignment to DeMassa.