**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Maria Lilia ROJAS, Defendant-Appellant.**

No. 80–5977.

United States Court of Appeals,
Fifth Circuit.*
Unit B

March 26, 1982.

Rehearings Denied April 19, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Thomas F. Almon, Miami, Fla., for defendant-appellant.

Thomas D. Sclafani, Linda Collins Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before MORGAN, RONEY and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Appellant, Maria Rojas, was convicted after a bench trial of transporting in excess of $5,000 in currency out of the United States without filing a report as required by 31 U.S.C. § 1101. On appeal she contends that certain evidence and statements she made should have been suppressed as fruits of an illegal detention and search, and that the evidence was insufficient to sustain her conviction. We reject appellant's arguments and affirm.

## I. Background

On August 22, 1980, the Miami Drug Enforcement Administration (DEA) office received information from the DEA office in Bogota, Columbia that the following day a woman would be departing from the Miami airport on a commercial airline flight for Bogota, carrying $1,000,000 in cash. This information had been given to the Bogota DEA office by a previously reliable [1] confidential informant, who also had provided a Miami telephone number for the woman. Miami DEA agents were able to match the telephone number with a call-back number left with Braniff Airlines by one Maria Lilia Rojas to reserve a seat on the August 23 Braniff flight 905 to Bogota.

The following afternoon, DEA and United States Customs agents proceeded to Miami International Airport and learned that a woman identifying herself as Rojas had checked in for flight 905 and deposited her luggage for loading. The luggage was segregated and kept under surveillance by the agents. The agents also obtained a description of Rojas from the ticket agent and later observed a woman fitting that description at the gate area of flight 905. Customs Inspector Juan Jimenez, fluent in both English and Spanish, made an announcement in both languages over the public address system informing all persons in the gate area of the currency reporting requirements. With reporting forms in hand, Jimenez then specifically asked appellant if she was taking more than $5,000 out of the country; she responded "no." When Jimenez repeated his question, appellant laughed and said "I wish I had $5,000. I don't."

After the flight was called for boarding, appellant presented her pass to the Braniff employee and began to walk down the jetport onto the airplane. At that point two Customs officers approached her, identified

---

1. The informant had on two prior occasions provided the DEA with information which led to seizures of 300 pounds of cocaine in Miami and 200 pounds of cocaine in Bogota, respectively.

themselves, and asked appellant if she was Lilia Rojas. When she responded affirmatively, the agents asked appellant to step out of the jetport and informed her that they had information she was carrying over $5,000 in currency. When Rojas again denied the allegation, the agents asked her to accompany them to an examination room.

Upon arriving at the examination room, Inspector Jimenez informed appellant in Spanish that she was being detained for questioning and advised her of her constitutional rights. Rojas responded that she understood. The segregated luggage was brought to the room and appellant identified it. Jimenez then read a Spanish translation of a consent to search form to Rojas; she indicated she understood the translation and signed and dated the form. The agents opened the luggage and found six Monopoly game boxes sealed in cellophane. Inside the boxes was approximately $1,500,000 in $100 bills. Appellant was then formally arrested, and a search of her purse yielded an additional $12,500 in cash. The agents also obtained from appellant certain oral and written statements which were later used at trial.

Appellant was charged in a three-count indictment, and moved pre-trial to suppress the evidence and statements resulting from her airport detention. After a hearing, a magistrate recommended that Counts One and Three [2] be dismissed and the motions to suppress be denied. The district judge accepted these recommendations and held a bench trial on Count Two, which resulted in appellant's conviction and a sentence of one-year imprisonment.

II. The Crime Under 31 U.S.C. § 1101

Title 31, United States Code, Section 1101 states in relevant part:

Persons required to file

(a) Except as provided in subjection (c) of this section, whoever, whether as principal, agent, or bailee, or by an agent or bailee, knowingly—

(1) transports or causes to be transported monetary instruments—

(A) from any place within the United States to or through any place outside the United States, or

(B) to any place within the United States from or through any place outside the United States, or

(2) receives monetary instruments at the termination of their transportation to the United States from or through any place outside the United States

in an amount exceeding $5,000 on any one occasion shall file a report or reports in accordance with subsection (b) of this section.

Section 1058 of the same title states:

Criminal penalty

Whoever willfully violates any provision of this chapter or any regulation under this chapter shall be fined not more than $1,000, or imprisoned not more than one year, or both.

Appellant urges that her conviction cannot stand because the evidence failed to show that she actually transported over $5,000 in currency out of the United States. We disagree.

■ This issue is one of first impression in this circuit. Our normal first step in construing a statute is to interpret the statutory language in accordance with its "plain meaning." *E.g., United States v. Yeatts,* 639 F.2d 1186, 1189 (5th Cir. 1981). Contrary to appellant's argument, however, the crime which § 1101 punishes is not the transportation of more than $5,000 in currency out of the United States, but rather the failure to file the required report. Thus the key to establishing a violation of the section is determining at what point filing becomes necessary. As to this, the statute is silent. The Treasury Department, however, in accordance with the Congressional mandate, *see* 31 U.S.C. § 1058, has issued regulations implementing the currency re-

---

**2.** Count I was a conspiracy charge under 18 U.S.C. § 371. Count III charged appellant with the aggravated offense under 31 U.S.C. § 1059

for violating the reporting requirements in the furtherance of another violation of federal law.

porting requirements.[3] Specifically, 31 C.F.R. § 103.25(b) provides that the reports required by § 1101 "shall be filed . . . at the time of departure. . . ." Thus our inquiry here is whether appellant had reached the "time of departure" without filing the necessary report.

We conclude that after the flight had been called for boarding and appellant had stepped onto the jetport preparing to board the plane, the critical "time of departure" had been reached. At this point, appellant had unequivocally manifested an intention to leave the United States, and although stepping on the jetport is not the latest temporal point which could be interpreted as the "time of departure," fixing this critical point at a later time would create a myriad of practical problems for enforcing the law and thus run counter to Congressional intent. Interpreting the "time of departure" as actual boarding of the plane, for example, would require having a customs officer on board every international flight departing the United States to collect the proper forms and would place an intolerable burden upon law enforcement. Any later time, moreover, would compound these problems.

Our decision as to what constitutes the time of departure is supported by the Second Circuit's analysis in *United States v. Gomez-Londono*, 553 F.2d 805 (2d Cir. 1977). In *Gomez-Londono*, a reliable informant had notified the DEA that the appellee would be departing New York for Columbia, South America, carrying $100,000 for the completion of a drug deal. Customs agents then observed Gomez-Londono at the departure area for Avianca Airlines, approached him, and warned him of the currency reporting requirements. He at first denied having more than $5,000 in currency, but after being questioned further, handed agents an envelope containing $10,000. The Customs agents then arrested Gomez-Londono and obtained a warrant to search his luggage. At a pre-trial suppression hearing, the district court held that the warrant was improper, in part because Go-

mez-Londono's conduct had not violated § 1101. The Second Circuit reversed, holding that the magistrate who had issued the warrant properly could have concluded that Gomez-Londono had reached a point at which filing was required. *Id.* at 810.

Because Rojas was not detained until she actually entered the jetport to board her flight, the case before us is even stronger than *Gomez-Londono*. Our interpretation of the "time of departure," moreover, does not conflict with the "rule of lenity" requiring strict construction of criminal statutes. "The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose. . . . Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers." *United States v. Moore*, 423 U.S. 122, 145, 96 S.Ct. 335, 347, 46 L.Ed.2d 333 (1975) (quoting *United States v. Brown*, 333 U.S. 18, 25–26, 68 S.Ct. 376, 379–380, 92 L.Ed. 442 (1948)).

In light of our interpretation of the "time of departure," the evidence uncontrovertibly showed that appellant, by entering the jetport without filing the necessary reports, denying for the third time that she was carrying over $5,000 in currency, and foregoing a final opportunity to satisfy the reporting requirements, committed the crime delineated in 31 U.S.C. § 1101.

### III. The Suppression Motion

Appellant's second argument is that the evidence uncovered by the search of appellant's luggage and purse, as well as the statements appellant made during interrogation, should have been suppressed as fruits of an illegal detention. We reject this argument.

Both the government and appellant vigorously argue whether the search at issue was a "border search," thus falling within Customs' plenary authority to search lug-

---

**3.** These regulations are contained in 31 C.F.R. part 103.

gage at the border without any modicum of suspicion of criminal activity. *E.g., United States v. Sheikh,* 654 F.2d 1057, 1068 (5th Cir. 1981). Although all prior cases in this circuit have applied "border search" analysis only to persons or objects entering the country, the government asserts that the border search rationale applies equally to persons such as appellant who are leaving the country.[4] Appellant disputes this assertion. We, however, need not decide this issue, because we find that even though the detention of Rojas under non-border search analysis required probable cause, probable cause existed at the time Rojas was detained and the subsequent searches were done pursuant to valid consent.

In the recent en banc case *United States v. Berry,* 670 F.2d 583 (5th Cir. 1982), this court set definitive guidelines for applying the fourth amendment requirements to airport stops, interrogations, and searches of criminal suspects by law enforcement officials. Specifically, we identified three types of police-citizen encounters: "communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause." *Id.* at 591. The essence of appellant's position is that her detention fell into the third category requiring probable cause. Appellant asserts that probable cause did not exist in this case, however, noting that the govern-

ment agents agreed prior to the Miaimi airport surveillance operation that they did not have sufficient grounds to obtain a warrant to search appellant's luggage. Our first step in analyzing the suppression issue, therefore, is to decide whether the initial stop of Rojas on the jetport was a seizure, and if so, whether the requisite level of suspicion supported it.[5]

In *Berry* we held that a stop was a seizure if "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *Id.* at 591 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). We conclude that the actions of the Customs officials in stopping Rojas on the jetport constituted a seizure initially requiring reasonable suspicion. At the time Rojas was stopped, she already had been questioned twice about transporting over $5,000 in currency without filing the proper report. The stop impeded her boarding the airplane; she was asked to step out of the jetport and was told that Customs officers had information that she possessed over $5,000 in currency. Given these circumstances, two of which were specifically mentioned in *Berry* as weighing in favor of finding a seizure,[6] we conclude that a reasonable person would no longer have thought he was free to leave and a seizure occurred.[7] We, however, find that reasonable suspicion supported this seizure. At the time of the stop, Customs agents had information from a reliable in-

---

4. The Ninth Circuit has so held under different facts in *United States v. Stanley,* 545 F.2d 661 (9th Cir. 1976).

5. Although the magistrate found that Rojas had voluntarily accompanied Customs agents to the interrogation room and these findings were adopted by the district court, our subsequent decision in *United States v. Berry,* 670 F.2d 583 (5th Cir. 1982) necessitates our re-evaluating the facts. Though we could remand to the district court for review of the magistrate's findings, we have the authority to review the findings on appeal in the interests of judicial economy. *Id.* at 604; *United States v. Lewis,* 621 F.2d 1382, 1386 (5th Cir.), *cert. denied,* 450 U.S 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1980).

6. In *Berry* we cited as evidence that a seizure had occurred "implicit constraints on an individual's freedom" and statements by law enforcement officials that the individual was suspected of criminal activity. *Berry, supra,* at 597.

7. In its brief and at oral argument the government asserted that the agents had been instructed to permit Rojas to board the plane if she insisted. This instruction was unknown to Rojas and therefore is irrelevant to determining whether a reasonable person would have thought he was free to leave.

formant that Rojas was carrying $1,000,000 in cash, and the agents knew that she had twice denied this and had refused to fill out a reporting form. These facts constituted reasonable suspicion meriting further investigation. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 22–23, 88 S.Ct. 1868, 1880–1881, 20 L.Ed.2d 889 (1968) (suspicious conduct of defendants coupled with officer's experience justified stop to further investigate possible preparation to rob a store); *Berry, supra*, at 590.

■ Concluding that the initial stop was proper, however, does not end the analysis, because after appellant again denied carrying more than $5,000 in currency, the Customs officials "requested" Rojas to accompany them to an interrogation room for questioning. Thus the second analytical step requires our determining whether this further detention of Rojas was proper under the principles delineated in *Berry*. After reviewing the facts, we conclude that this detention was not voluntary and therefore was a seizure requiring probable cause. Although Customs officers asked Rojas to accompany them and she did so without objection, in light of the overall coercive nature of the stop outlined above we cannot say that Rojas voluntarily consented to accompany Customs officials. As we noted in *Berry*, acquiescence cannot substitute for free consent. *Id.* at 597. The removal of appellant to an office for interrogation without her consent, moreover, is precisely the type of seizure which we held in *Berry* "is only constitutional if accompanied by probable cause." *Id.* at 602.

Contrary to appellant's assertions, however, we find that probable cause existed to detain Rojas once she had denied, for the third time, that she was carrying over $5,000 in currency and refused to file a report. As we noted in part II, above, Rojas' refusal to file the necessary forms at the time of departure constituted the crime.

Given the information possessed by Customs and Rojas' steadfast refusal to file under § 1101, the Customs agents in effect witnessed the crime and hence had probable cause to arrest appellant.

■ Appellant's argument that probable cause could not have existed because the agents had agreed earlier that they lacked sufficient grounds to obtain a search warrant is misdirected. First, the facts necessary to show probable cause to arrest are not necessarily the same as those required to show probable cause to search. The right to arrest occurs when probable cause exists that the person to be arrested has committed or is committing a crime. A search, on the other hand, requires probable cause that the search will uncover evidence of a crime.[8] *Compare, e.g., United States v. Tookes*, 633 F.2d 712 (5th Cir. 1980) (probable cause to arrest exists when facts and circumstances within arresting officer's personal knowledge, or of which they have reasonably trustworthy information, are sufficient for a person of reasonable prudence to believe offense has been or is being committed) *with United States v. Green*, 634 F.2d 222, 225 (5th Cir. 1981) (probable cause to search exists when facts warrant a reasonable person to believe that the objects sought in connection with a crime will be found). *See United States v. Melvin*, 596 F.2d 492 (1st Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) (even if police do not have probable cause to arrest, a person's property may be searched upon probable cause to believe that fruits, instrumentalities, or evidence of the crime are present). *See generally*, 1 W.LaFave, Search & Seizure § 3.1(b) (1978). Second, the agents were correct in concluding that, prior to the observations at Miami Airport, probable cause to search did not exist. Prior to the airport surveillance, the agents knew only that Rojas would be transporting over $5,000 in currency out of the United States. As we have discussed above, nei-

---

8. Thus warrants are issued for surveillance or tracking devices on probable cause that the "search" (the surveillance or tracking) will uncover evidence of a crime, even though the crime may not yet have been committed. *See, e.g., United States v. Flynn*, 664 F.2d 1296 (5th Cir. 1981).

ther possessing nor transporting over $5,000 in currency is a crime. Hence, the agents had neither probable cause that a crime had been or was being committed (probable cause for arrest) nor probable cause that a search of appellant's luggage would produce evidence of a crime. Probable cause to arrest did not exist until Rojas, having reached the "time of departure," failed to file the necessary reports. At this time, however, exigent circumstances, in the form of the suspect's imminent departure from the jurisdiction, excused the agents from obtaining a warrant. *E.g., United States v. Kreimes,* 649 F.2d 1185 (5th Cir. 1981).[9]

 Her detention being proper, appellant's argument that the subsequent search was tainted by an illegal detention necessarily fails. Appellant urges, nevertheless, that 31 U.S.C. § 1105 requires that Customs agents obtain a warrant prior to any search for evidence of currency reporting violations. This section reads:

Enforcement authority

(a) If the Secretary has reason to believe that monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this title has not been filed or contains material omissions or misstatements, he may apply to any court of competent jurisdiction for a search warrant. Upon a showing of probable cause, the court may issue a warrant authorizing the search of any or all of the following:

(1) One or more designated persons.

(2) One or more designated or described places or premises.

(3) One or more designated or described vehicles.

Any application for a search warrant pursuant to this section shall be accompanied by allegations of fact supporting the application.

(b) This section is not in derogation of the authority of the Secretary under any other law.

Appellant cites this section and the accompanying legislative history[10] for the proposition that any search commenced for the purpose of finding evidence of reporting violations must be accompanied by a warrant. We disagree. Both subsection (b) of § 1105 and the legislative history[11] indicate that Congress did not intend to attach a warrant requirement to an otherwise lawful search. Rather, § 1105 merely makes explicit that Customs searches for currency violations, in the absence of other authority to conduct the search, are subject to the fourth amendment warrant requirement.

 Here the magistrate found at the suppression hearing that the search was conducted pursuant to valid consent, a longstanding exception to the warrant requirement. *E.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Baldwin,* 644 F.2d 381, 383 (5th Cir. 1981). Our independent review of the record, moreover, convinces us that the consent to search was indeed voluntary. To be volun-

---

**9.** This is not to imply that a warrant would have been necessary absent the exigent circumstances. "The Constitution does not require that a warrant issue prior to an arrest based on probable cause, even if no exigent circumstances prevented the obtainment of a warrant." *United States v. Avila-Dominquez,* 610 F.2d 1266, 1271 (5th Cir. 1980) (citing *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 827–828, 46 L.Ed.2d 598 (1976)).

**10.** The Senate report stated:

The Secretary is given authority to conduct searches to enforce compliance provided he first obtains a search warrant from any court of competent jurisdiction upon a showing of probable cause. The purpose of the warrant

is to avoid an excessive burden on persons entering or leaving the country. However, nothing in the bill would limit the authority of the Secretary to conduct searches under existing law. Should unreported currency be discovered pursuant to a search by the Bureau of Customs under its existing legal authority, the person transporting the currency would be subject to the penalties under this legislation if the discovery of the unreported currency was incidental to the main purpose of the search.

S.Rep. No. 91–1139, 91st Cong., 2d Sess. 7 (1970).

**11.** See note 10, *supra.*

tary, consent must not be the product of duress or coercion; whether consent is voluntary is a fact to be determined from all the circumstances. *E.g., Schneckloth, supra,* 412 U.S. at 223, 227, 93 S.Ct. at 2045, 2047; *United States v. Garcia,* 496 F.2d 670, 673 (5th Cir. 1974), *cert. denied,* 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed.2d 768 (1975). The evidence at the suppression hearing showed that after entering the interrogation room, Inspector Jimenez informed appellant in Spanish of her constitutional rights, which appellant indicated she understood. Shortly thereafter Jimenez asked appellant if Customs could search her luggage. He translated into Spanish an English consent-to-search form and read it to appellant. This form advised appellant of her right to refuse consent, to require the agents to obtain a search warrant, to consult with an attorney prior to or during any search, and to withdraw consent at any time. After hearing the Spanish translation appellant indicated she understood the form, then signed and dated it. Under the circumstances, we do not find any evidence of coercion.

In summary, we hold that under the principles enunciated by the en banc court in *Berry,* the initial stop of Rojas on the jetport was a seizure requiring reasonable suspicion; that reasonable suspicion existed to support this seizure; that the further detention of Rojas for questioning was involuntary and required probable cause; that probable cause existed to support the detention; and that the searches of appellant's luggage and purse were made pursuant to valid consent. Accordingly, we find the district court properly denied the motion to suppress.

AFFIRMED.