792 F.2d 1470
 UNITED STATES of America, Plaintiff-Appellee,
v.
ONE HUNDRED TWENTY-TWO THOUSAND FORTY-THREE DOLLARS
($122,043.00) IN UNITED STATES CURRENCY, Defendant,
Cynthia Johnson Meixner, Claimant-Appellant.
 No. 84-6379.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 5, 1985.
Decided July 1, 1986.
As Amended Sept. 9, 1986.
 
 Stephen D. Petersen, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.
 William Genego, Los Angeles, Cal., for claimant-appellant.
 On Appeal From the United States District Court for the Central District of California.
 Before CANBY, BEEZER and HALL, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 The government filed a complaint for civil forfeiture against the defendant currency, alleging a violation of the currency reporting requirement for transporting more than $5,000 in monetary instruments outside the United States. Cynthia Johnson Meixner, claimant of the currency, timely appeals from the district court's order granting summary judgment for the government, 28 U.S.C. Sec. 1291. We affirm.
 
 
 2
 * On April 25, 1983, Cynthia Johnson Meixner arrived at Los Angeles International Airport uniquely attired for international travel. She was wearing a blouse and pants that concealed the leotards and tights she wore underneath. Inside the tights were six sewn pockets, and inside the pockets were secreted stacks of one-hundred dollar bills. Meixner entered the airport that day literally wearing $60,000 in United States Currency.
 
 
 3
 Meixner had her passport and a one-way, first-class airline ticket to Lima, Peru aboard Varig flight 833.[1] The ticket had been purchased with cash. She also had with her luggage, containing $60,600 in United States Currency, and her handbag, containing another $1,443. Meixner checked her luggage before she headed for the departure area.
 
 
 4
 About ten minutes before flight 833 began boarding, Customs Patrol Officer ("CPO") Burbach made an announcement over the public address system advising departing passengers of the currency reporting requirement. The announcement was made in both English and Spanish and could be heard in the ticketing area, on the departure level, and inside the connecting concourse. Meixner claims that she arrived late for her flight and did not hear the announcement.
 
 
 5
 Customs officers also had posted notices of the reporting requirement on the wall next to the gate from which flight 833 was scheduled to depart as well as throughout the departure level of the airport. The notice stated:
 
 
 6
 If you transport, mail, ship or receive more than $5,000 in currency of the U.S. or any other country, or monetary instruments (such as travelers checks, negotiable instruments in bearer form, or money orders) into or out of the United States, you must file a report with the U.S. Customs Service.
 
 
 7
 Ask a Customs Officer for a currency report form.
 
 
 8
 Failure to report can result in forfeitures of the monies and civil and criminal penalties (31 U.S.C. 1101, et seq.).
 
 
 9
 Department of the Treasury, U.S. Customs Service.
 
 
 10
 Meixner passed through the security checkpoint on the departure level. She walked past the notices on the walls on that level. She handed a portion of her boarding pass to the Varig employee at the gate for flight 833, and she walked past the notice located at the gate. At no time before she entered the jetway did Meixner ever attempt to complete a currency report form.
 
 
 11
 Three Customs Patrol Officers were stationed at the gate for flight 833. They moved onto the jetway after the announcement of the reporting requirement was made over the public address system. At about 1:00 p.m., passengers for flight 833 began to enter the jetway. Meixner stepped onto the jetway at 1:25 p.m.
 
 
 12
 When Meixner entered the jetway, CPO Johnson stopped Meixner, and the following colloquy commenced:
 
 
 13
 CPO JOHNSON: Excuse me ma'am, I'm a Customs Officer, are you taking more than $5,000 out of the country?
 
 
 14
 MEIXNER: No.
 
 
 15
 CPO JOHNSON: Do you understand that the transportation of money is legal but you have to report it?
 
 
 16
 MEIXNER: Yes.
 
 
 17
 CPO JOHNSON: Do you have more than $5,000?
 
 MEIXNER: No--about $3,000.[2]
 
 18
 CPO JOHNSON: Okay.
 
 
 19
 Meixner then proceeded up the jetway toward the plane. Two other Customs Officers were located close to the entrance of flight 833. They too stopped Meixner. CPO Burbach identified herself as a United States Customs Officer and asked Meixner for her passport. After Burbach examined the passport, Burbach asked Meixner again if she understood that the transportation of currency was legal but had to be reported. Meixner replied affirmatively. Meixner added that she had about $3,000 of her own money and that, in addition, she had $95,000 of her husband's money in her checked luggage. Burbach asked for the baggage claim check so that the agents could make an exact computation of the money in the suitcase.
 
 
 20
 Meixner handed Burbach the airline ticket and the appended claim check. CPO Fuller then asked CPO Johnson to bring Meixner a claim form. Johnson handed the claim form to Meixner and the following conversation ensued:
 
 
 21
 MEIXNER: I didn't understand because it's not my money, so I don't know why I need to fill this out. Am I going to miss my flight, I'll fill out the form but I didn't know I needed to if it wasn't my money.
 
 
 22
 JOHNSON: How much money do you have?MEIXNER: About $3,000--I don't know--are you going to make me miss my flight--I'll fill out the form.[2]
 
 
 23
 JOHNSON: Before I check your take-on luggage and purse, are you sure that you only have $3,000?
 
 
 24
 MEIXNER: I have about $10,000.
 
 
 25
 JOHNSON: Where is it?
 
 
 26
 Meixner pointed to her right thigh. CPO Johnson could see a bulge on her left thigh which appeared to be the same shape and size as the bulge on her right.
 
 
 27
 Meixner was taken to the Customs Inspection Area where she was searched. Sixty-thousand dollars in $100 bills were found on her person; another $60,600 were found in her luggage, and $1,443 were concealed within her purse. Meixner attempted to explain the large sum of money stating that it was to be used by her husband in the cultivation of his jojoba plantation.
 
 
 28
 The government filed a complaint alleging two counts of civil forfeiture as to the defendant currency.[3] This appeal arises from the district court's grant of summary judgment in favor of the government based upon the government's claim under 31 U.S.C. Sec. 5317 (the currency reporting requirement). The district court held that Meixner's duty to file attached at the time of the first stop on the jetway and that her belated efforts to comply with the reporting requirements did not negate her earlier failure to file.
 
 II
 
 29
 The district court's entry of summary judgment is reviewable de novo. Allen v. A.H. Robins Co., 752 F.2d 1365, 1368 (9th Cir.1985).
 
 
 30
 In order to have standing to challenge a forfeiture action, a claimant must claim " 'to own the article or merchandise or to have an interest therein.' " United States v. 1982 Sanger 24' Spectra Boat, 738 F.2d 1043, 1046 (9th Cir.1984), quoting United States v. $15,500 in United States Currency, 558 F.2d 1359, 1360 (9th Cir.1977).
 
 
 31
 The district court correctly found that Meixner had a possessory interest in the currency she asserted she was carrying for her husband. However, the district court held that an individual must have an ownership interest in seized property to have standing to contest its forfeiture. This ruling directly conflicts with our decision in 1982 Sanger, which specifically held that a lesser property interest such as possession is sufficient to grant standing to a claimant in a forfeiture proceeding.[4] 738 F.2d at 1046.
 
 
 32
 Meixner had and has continually asserted a possessory interest in the defendant currency. Under 1982 Sanger, she has standing to challenge its forfeiture.[5] The district court therefore erred in finding that Meixner lacked standing to contest the instant forfeiture proceedings.
 
 III
 
 33
 The government seeks forfeiture of the currency under 31 U.S.C. Sec. 5317(b) (1982), which provides for the seizure and forfeiture of currency transported in violation of the reporting requirement, 31 U.S.C. Sec. 5316 (1982). Section 5316(a) requires an individual, his agent or bailee to file a report "when the person, agent, or bailee knowingly--(1) transports or has transported monetary instruments of more than $5,000 at one time--(A) from a place in the United States to or through a place outside the United States...." (Emphasis added.)
 
 
 34
 Meixner points to the "knowingly" language in this statute and argues that an element of a section 5316 violation is that the person transporting the currency know that he or she is doing so in violation of the reporting requirement. Meixner argues that the government's case consequently must fail as she did not know she was required to report currency which, although in her possession, belonged to her husband.
 
 
 35
 The plain language of the statutory provisions, 31 U.S.C. Secs. 5316-5317, does not include knowledge of the reporting requirement as an element for forfeiture. The only knowledge requirement is that the person know that he or she is transporting more than $5,000[6] out of the country.
 
 
 36
 Meixner's argument concerning knowledge of the reporting requirement is based on cases which construe the criminal provisions of the Currency and Foreign Transactions Reporting Act. E.g., United States v. Chen, 605 F.2d 433, 434 (9th Cir.1979) (issue was whether defendant willfully violated currency reporting requirement as prohibited by what is now 31 U.S.C. Sec. 5322). The forfeiture provision of section 5317(b) contains no similar willfulness requirement.
 
 
 37
 As the Second Circuit has recently noted, the decisions are not unanimous is holding that proof of knowledge of the reporting requirement is not required for forfeiture. See United States v. $26,600 in U.S. Currency, 777 F.2d 111, 112 (2d Cir.1985) (per curiam). The Eleventh Circuit has recently required a showing of knowledge. In United States v. One (1) Lot of $24,900 in U.S. Currency, 770 F.2d 1530, 1533 (11th Cir.1985), that court held that, because knowledge of the reporting requirement is an element of a criminal violation of section 5316, it must also be an element of the civil offense defined by the same statute. We respectfully disagree. In our view, the criminal violation is defined by section 5322, a statute that punishes willful violations of the Currency and Foreign Transaction Reporting Act. As we held in Chen, the term "willfully" in section 5322(a) makes knowledge of the reporting requirement an additional element that the government must prove in order to secure a criminal conviction. See Chen, 605 F.2d at 434; see also 31 U.S.C. Sec. 5321(a)(2) (permitting the imposition of a civil penalty in addition to forfeiture for violations of section 5316; no use of word "willfully" in statute); United States v. $831,160.45 United States Currency, 607 F.Supp. 1407, 1414 (N.D.Cal.1985) (knowledge of reporting requirement not necessary for forfeiture under section 5317), aff'd mem., 785 F.2d 317 (9th Cir.1986); United States v. United States Currency Amounting to Sum of $5,393.00, 583 F.Supp. 1447, 1449 (E.D.N.Y.1984) (same).
 
 
 38
 The plain language of the statute controls. "Knowingly" in the statute modifies the verb "transports." The section does not support a reading that knowledge of the reporting requirement is an element of a section 5316 violation. See United States v. Flores, 753 F.2d 1499, 1505 (9th Cir.1985) (en banc) (construing similar language in the Gun Control Act, 18 U.S.C. Sec. 922(e) (1982)). The district court therefore correctly concluded that the government did not have to prove Meixner's knowledge of the reporting requirement to establish its forfeiture case.
 
 IV
 
 39
 The currency reporting requirement, 31 C.F.R. Sec. 103.25(b) (1983), provides that "[r]eports ... shall be filed at the time of entry into the United States or at the time of departure...." In granting the government's motion for summary judgment, the district court held that Meixner had reached the "time of departure" without filing the requisite currency report form. While we have never expressly addressed the question of what constitutes the "time of departure," three courts of appeals and a district court of this circuit have had occasion to construe the language in accordance with the intent underlying the regulation.
 
 
 40
 Perhaps the leading case interpreting the language of 31 C.F.R. Sec. 103.25(b) and the meaning of "time of departure" is United States v. Rojas, 671 F.2d 159 (5th Cir.1982).[7] In Rojas, Customs Officers at Miami International Airport made an announcement similar to that made here describing the reporting requirement over the public address system. A Customs Officer with reporting forms in hand stopped Rojas and asked her if she were transporting more than $5,000 out of the United States. Rojas responded, "No." When asked again Rojas laughed and said, "I wish I had $5,000." Id. at 161.
 
 
 41
 Rojas' flight was called for boarding. She handed her boarding pass to a Braniff employee and began to walk down the jetway. Two Customs Officers stopped her and requested that she accompany them to an examination room. A search of Rojas' luggage revealed $1,500,000 in United States Currency hidden in Monopoly boxes and an additional $12,500 in Rojas' purse. Id. at 161-62.
 
 
 42
 The court held that Rojas had failed to report currency in excess of $5,000 at the "time of departure" as required by 31 C.F.R. Sec. 103.25(b). The court stated:
 
 
 43
 We conclude that after the flight had been called for boarding and appellant had stepped onto the jetport preparing to board the plane, the critical "time of departure" had been reached. At this point, appellant had unequivocally manifested an intention to leave the United States, and although stepping on the jetport is not the latest temporal point which could be interpreted as the "time of departure," fixing this critical point at a later time would create a myriad of practical problems for enforcing the law and thus run counter to Congressional intent. Interpreting the "time of departure" as actual boarding of the plane, for example, would require having a customs officer on board every international flight departing the United States to collect the proper forms and would place an intolerable burden upon law enforcement. Any later time, moreover, would compound these problems.
 
 
 44
 Id. at 163 (emphasis added).
 
 
 45
 The Rojas panel also rejected the contention that its decision conflicted with the doctrine of strict construction ordinarily invoked in the interpretation of statutes imposing penalties.
 
 
 46
 "The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose.... Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers."
 
 
 47
 Id. (citations omitted).
 
 
 48
 The facts of Rojas coupled with the court's reasoning in that case indicate that Meixner violated 31 C.F.R. Sec. 103.25(b) in this case. Meixner unequivocally manifested an intention to leave the United States in violation of the currency reporting requirement when she entered the jetway after stating that she was carrying less than $5,000 in United States Currency.
 
 
 49
 In United States v. Gomez-Londono, 553 F.2d 805 (2d Cir.1977), rev'g, 422 F.Supp. 519 (E.D.N.Y.1976), the Second Circuit had the opportunity to address the "time of departure" language in the context of reviewing a search warrant issued under 31 U.S.C. Sec. 1105 (1976).[8] In that case, a reliable DEA informant had notified customs agents that Gomez-Londono would be leaving the United States with $100,000 in United States Currency procured in a recent narcotics transaction. Customs agents began surveillance at Kennedy International Airport and stopped Gomez-Londono as he walked toward the departure area for his international flight. Customs Agents informed Gomez-Londono that he was required to file a report if he was transporting more than $5,000 out of the United States. Gomez-Londono was asked twice whether he had more than $5,000; he replied "No" and showed the agents the $900 he had in his pocket. The agents asked Gomez-Londono the question a third time at which point he removed an envelope containing $10,000 in United States Currency.
 
 
 50
 In validating the search warrant the court stated:
 
 
 51
 [I]n light of the fact that appellee had obtained a ticket, had checked his baggage, and was headed toward the departure area when he was stopped, we find that the magistrate could reasonably have concluded that there was probable cause to believe appellee had reached a point at which he was "required" to file a report.
 
 
 52
 Id. at 810.
 
 
 53
 Indeed, in United States v. $831,160.45 United States Currency, 607 F.Supp. 1407 (N.D.Cal.1985), aff'd mem., 785 F.2d 317 (9th Cir.1986), the district court held that a traveler, who admitted that he knew of the reporting requirement and had intended not to comply with it, had reached the "time of departure" when he attempted to pass through the x-ray checkpoint at San Francisco International Airport, after having checked his luggage and received his boarding pass.
 
 
 54
 The district court in $831,160.45 United States Currency stated that the time of departure was "reached when one is reasonably close, both spatially and temporally, to the physical point of departure itself, and manifests a definite commitment to leave." Id. at 1413.[9] This formulation was subsequently adopted by the Fourth Circuit in United States v. Ozim, 779 F.2d 1017, 1018 (4th Cir.1985). There the court upheld criminal convictions of airline passengers who had secured their boarding passes and seat assignments, and had taken or attempted to take unreported currency into the departure area to await a flight expected to depart within two hours.
 
 
 55
 What emerges from these cases is a functional rule that accounts for the variety of circumstances that may attend departure from the United States. Forfeiture turns on a reasonable proximity both in space and time to the physical point of departure coupled with a manifest intention to leave the country. We believe this formulation to be a workable standard consistent with the legislative intent embodied in 31 U.S.C. Sec. 5316.[10]
 
 
 56
 In applying that approach here we note that Meixner progressed further than any claimant in any of the foregoing cases. Meixner manifested the clear intention of covertly transporting the defendant currency out of the United States. She checked her baggage, passed through security and presented her boarding pass. At the time she was finally apprehended she stood at the end of the jetway next to the entrance of the international flight she was scheduled to board. She was extremely close both spatially and temporally to the physical point of departure. We, therefore, conclude that the district court's order of forfeiture is well-founded based upon the case law and the evident statutory purpose of the currency reporting requirement. Rojas, 671 F.2d at 163.
 
 V
 
 57
 As we have noted, 31 C.F.R. Sec. 103.25(b) represents the Secretary's effort to proscribe conduct that may manifest itself in a variety of forms due to the differing structures of airports and the divergent locations of facilities within them. Because the regulation must govern conduct that may arise in many different settings, the term "time of departure" is somewhat imprecise. Despite the imprecision, the regulation is not unconstitutionally vague.
 
 
 58
 An ordinance fails for want of specificity only when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954), or when the regulation "encourages arbitrary and erratic arrests and convictions." Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). Greater leeway is allowed when statutes are regulatory in nature and do not inhibit the exercise of constitutional rights, Id.; Colautti v. Franklin, 439 U.S. 379, 390-91, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979), even if criminal penalties are involved. See, e.g., United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952); United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947).
 
 
 59
 Even assuming that statutes imposing civil forfeiture need be as carefully tailored as those meting out criminal penalties, the regulation attacked here is drafted with sufficient specificity to fall well within a series of Supreme Court decisions upholding regulatory statutes and ordinances against vagueness challenges. In fact, this case is indistinguishable from Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952). That case involved a vagueness challenge to a regulation promulgated by the Interstate Commerce Commission pursuant to a statute giving the Commission the power to regulate the transportation of hazardous materials, 18 U.S.C. Sec. 835 (Supp. V 1951). The regulation in Boyce Motor Lines provided:
 
 
 60
 Drivers of motor vehicles transporting any explosive, inflammable liquid, inflammable compressed gas, or poisonous gas shall avoid, so far as practicable, and, where feasible, by prearrangement of routes, driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings.
 
 
 61
 Boyce Motor Lines, 342 U.S. at 338-39, 72 S.Ct. at 330 (footnote omitted). The statute provided that anyone who knowingly violated the regulation shall be subject to fine or imprisonment or both. Id.
 
 
 62
 The Court rejected petitioner's argument that the regulation was unconstitutionally vague stating:
 
 
 63
 A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variation in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.
 
 
 64
 Id. at 340, 72 S.Ct. at 330-31 (footnotes omitted).
 
 
 65
 Boyce Motor Lines along with other kindred Supreme Court decisions dealing with regulatory measures leads us to reject a vagueness argument here.[11] The term "time of departure" is sufficiently definite to give notice to a person who would avoid its penalties and to give guidance to courts that would enforce the regulation. Meixner not only dared to venture perilously close to the line drawn by 31 C.F.R. 103.25(b), she crossed it.
 
 
 66
 Accordingly, the district court's grant of summary judgment ordering forfeiture of the defendant currency is
 
 
 67
 AFFIRMED.
 
 BEEZER, Circuit Judge, dissenting in part:
 
 68
 This court today affirms the district court's summary judgment in favor of the government in its action for civil forfeiture against the defendant currency. The majority concludes that Cynthia Johnson Meixner, the claimant of the currency, violated the currency reporting laws by failing to report the transportation of more than $5,000 in monetary instruments outside the United States as required under 31 U.S.C. Sec. 5317 (1982).
 
 
 69
 I cannot agree that an individual, who was prevented by customs agents from filing a currency transportation report after she was stopped on the jetway to an international flight, can be regarded as having failed to make a report at the "time of departure" from the United States as provided by the applicable regulation. Before the government may invoke the harsh penalty of forfeiture, constitutional due process requires the government to demark a reasonably definite point at which the duty to file a currency transportation report arises. Because I conclude that the phrase "time of departure" is impermissibly vague as applied in this case, I respectfully dissent.[1]
 
 
 70
 * Background
 
 
 71
 On April 25, 1983, Cynthia Johnson Meixner arrived at Los Angeles International Airport to take a flight from Los Angeles to Lima, Peru. Meixner proceeded to the jetway leading to the airplane when her flight was called.
 
 
 72
 After entering the jetway, Customs Patrol Officer ("CPO") Johnson asked Meixner if she was taking more than $5,000 out of the country. Meixner said no.[2] Agent Johnson explained that the transportation of larger sums was legal but must be reported and asked Meixner if she understood. Meixner responded affirmatively. She was then asked if she had more than $5,000, and she replied, "No, about $3,000." At the end of the jetway, Meixner was questioned by two other CPOs. She was again asked if she had more than $5,000 with her. Although she initially responded no, she later told the agents that she had about $3,000 of her own money and about $95,000 of her husband's money in her luggage. She told the agents she did not know she had to report her husband's money.
 
 
 73
 Meixner was given a currency transportation reporting form which she began to fill out. Agent Johnson then said, "Before I check your take-on luggage and your purse, are you sure that you only have $3,000?" Meixner replied, "I have about $10,000." Agent Johnson asked, "Where is it?" Meixner pointed to a bulge in her stockings on her right thigh. The agent saw a similar bulge on her left thigh. Meixner was then handcuffed and taken to the Customs Inspection Area for questioning. She was not allowed to complete the currency reporting form. The agents searched Meixner and found six packets of cash in specially sewn pockets in her stockings totaling $60,000. Agents found $60,000 in Meixner's luggage and $1,443 in her purse.[3]
 
 II
 Failure to Report
 
 74
 The government seeks forfeiture of the currency under 31 U.S.C. Sec. 1317(b) (1982), which provides for the seizure and forfeiture of currency transported in violation of the reporting requirement, 31 U.S.C. Sec. 5316 (1982). Section 5316(a) requires an individual to file a report "when the person, agent, or bailee knowingly--(1) transports or has transported monetary instruments of more than $5,000 at one time--(A) from a place in the United States to or through a place outside the United States...." The statute delegates to the Secretary of the Treasury the authority to issue regulations designating the specific "time and place" at which such a report is to be filed.
 
 
 75
 In order to prevail on its summary judgment motion, the government must prove that Meixner transported the defendant currency out of the United States without filing a report. 31 U.S.C. Sec. 5316 (1982). The lack of definiteness in the governing regulation prevents us from making that determination under the facts of this case.[4]
 
 
 76
 Civil forfeiture is such a harsh penalty that a reasonable degree of definiteness in the governing statute or regulation should be required before imposing it upon an individual. The point at which the duty to file a currency report arises should be delineated with such specificity that it does not encourage arbitrary enforcement by customs agents, see Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and that it affords fair warning of the point at which the duty to report is activated such that individuals can reasonably rely upon it in regulating their own conduct, see Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 502, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).
 
 
 77
 The governing regulation, 31 C.F.R. Sec. 103.25(b) (1983), provides only that the currency transportation report "shall be filed at the time of entry into the United States or at the time of departure...." The government contends the duty to file the report attached at the time Meixner was first stopped on the jetway by customs agents. It is impossible to find support for that assertion in the language of the regulation.
 
 
 78
 Read literally, the regulation does not impose the duty to file the report until an individual has actually crossed the international boundary line. Although this may be an unduly restrictive interpretation, it is difficult to determine from the plain language of the regulation at what earlier point the duty does arise. In fact, it is possible to conceive of a passenger, running late for an international flight, being aware of the reporting requirement as outlined in the regulation and yet believing he could secure his seat on the airplane before requesting the report form to fill out. The regulation does not clearly label such conduct a violation.
 
 
 79
 The instant case presents a less extreme situation. Meixner was at the end of the jetway but had not yet boarded the airplane. When the currency reporting form was made available to her, she offered and attempted to complete it, but was not allowed to by the customs agents. I simply cannot ascertain from the regulation that she had effectively passed the point of departure from the country.[5]
 
 
 80
 I recognize that the Fifth Circuit, in United States v. Rojas, 671 F.2d 159, 163 (5th Cir.1982)[6], concluded that the critical "time of departure" was reached after the flight had been called and appellant had stepped onto the jetway preparing to board the airplane. The court determined that appellant had at that point "unequivocally manifested an intention to leave the United States." Id. See also United States v. $831,160.45 United States Currency, 607 F.Supp. 1407, 1412-14 (N.D.Cal.1985) ("time of departure" is reached "when one is reasonably close, both spatially and temporally, to the physical point of departure itself, and manifests a definite commitment to leave"), aff'd, 785 F.2d 317 (9th Cir.1986) (mem.); United States v. Gomez Londono, 422 F.Supp. 519, 525 (E.D.N.Y.1976) (under currency reporting regulation, time of departure could not be reached until person actually boarded airplane or at least received boarding pass and was ready to board), rev'd on other grounds, 553 F.2d 805 (2d Cir.1977).
 
 
 81
 As proposed policy, these holdings are not without merit. However, the statute expressly delegates to the Secretary of the Treasury the power to prescribe the "time and place" at which the report is to be filed. 31 U.S.C. Sec. 5316(b) (1982). The Secretary has declined to exercise that authority; it is not the province of this court to make that policy judgment for him.[7]
 
 
 82
 I do not insist as a matter of law that air travelers be permitted to wait until the exact moment they cross an international border or even until they board an aircraft before they can be held to a duty to file a report. The Secretary is free to demark a functional equivalent of the border at which point the duty arises. Such a demarcation could be established as the point of passing through security, obtaining a boarding pass, entering the jetway, or a combination of these or other factors. The Secretary has simply neglected to specify any point at all.
 
 
 83
 I conclude that the regulation is unconstitutionally vague as applied to the claimant under the facts of this case. Under the plain language of the statute and regulation, Meixner could reasonably conclude that she relented in time to file the currency report before the actual "time of departure."[8] The customs agent's refusal to allow her to complete the form should prevent the government from charging non-compliance with the reporting requirement. Forfeiture of the defendant currency exacts a substantial penalty for violating a regulation that fails to precisely designate the time and place where the duty to act arises.[9]
 
 
 84
 Accordingly, I would hold that the district court erred as a matter of law in granting the government's motion for summary judgment. For this reason, I respectfully DISSENT.
 
 
 
 [1]
 Meixner's passport revealed numerous admission stamps to Central and South America as well as entries into several countries in the Far East. The passport also disclosed fifteen entries into the United States
 
 
 [2]
 On the basis of this answer, Meixner was convicted of making a false statement to a federal officer in violation of 18 U.S.C. Sec. 1001. She was sentenced to three years imprisonment
 
 
 [3]
 The government sought forfeiture both under the currency reporting requirement, 31 U.S.C. Sec. 5317, and under the forfeiture provision governing monies used to facilitate narcotics transactions, 21 U.S.C. Sec. 881
 
 
 [4]
 The district court entered its final order on July 31, 1984, just a few days after the Ninth Circuit filed its opinion in United States v. 1982 Sanger on July 25, 1984. It is therefore understandable that the district court made no reference to the 1982 Sanger case
 
 
 [5]
 Other circuits have also held that a possessory interest confers standing in a forfeiture action. See, e.g., United States v. $500,000, 730 F.2d 1437, 1439 (11th Cir.1984) ("One must claim an ownership or possessory interest in the property seized."); United States v. $3,799.00 in United States Currency, 684 F.2d 674, 678 (10th Cir.1982) (claimant who "had no actual or constructive possession" of the money seized lacked standing); United States v. $364,960.00 in United States Currency, 661 F.2d 319, 326 (5th Cir.1981) (claimant who was not "in possession of the property at the time it was seized" lacked standing in absence of showing ownership)
 
 
 [6]
 31 U.S.C. Sec. 5316(a)(1) was amended in 1984. The amount of currency subject to the reporting requirements was changed from $5,000 to $10,000. Pub.L. No. 98-473, Title II, Sec. 901(c)(2), 98 Stat. 2135 (1984)
 
 
 [7]
 Rojas was decided by a panel of the new Eleventh Circuit and is precedent in both the Fifth and Eleventh Circuits
 
 
 [8]
 Under 31 U.S.C. Sec. 1105 (1976), a search warrant may be issued upon a showing of probable cause that "monetary instruments are in the process of transportation and with respect to which a report required under section 1101 of this title has not been filed." Section 1105 has been amended and is now section 5317; section 1101 is now section 5316(a)
 
 
 [9]
 In $831,160.45 United States Currency, the court relied in part on United States v. Cutaia, 511 F.Supp. 619 (E.D.N.Y.1981). Cutaia held that passengers who had checked their baggage, received their boarding passes, and moved into the departure area had reached the critical "time of departure." We previously have cited to that portion of the Cutaia decision with approval. United States v. Duncan, 693 F.2d 971 (9th Cir.1982) cert. denied, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983)
 
 
 [10]
 The dissent asserts that cases like Rojas, Gomez-Londono, and $831,160.45 United States Currency arguably attempt to make a policy judgment reserved to the Secretary because the statute under which 31 C.F.R. Sec. 103.25(b) was promulgated delegates to the Secretary the power to prescribe the "time and place" at which a currency report form is to be filed. We believe that these decisions in no way invade the province of the Secretary because the Secretary has determined that the proper "time and place" for filing a report is the "time of departure." Once the Secretary has promulgated the regulation, it is decidedly the duty of this court to insure that the regulation is given its fair meaning in accord with the manifest intention of the lawmakers. Rojas, 671 F.2d at 163
 
 
 [11]
 See, e.g., United States v. National Dairy Products, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) (provision in Robinson-Patman Act making it a crime to sell goods at "unreasonably low prices for the purposes of destroying competition or eliminating a competitor" not void for vagueness); United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947) (upholding the constitutionality of a Communications Act provision making it a crime to coerce a radio-broadcasting licensee to employ "in excess of the number of employees needed by such licensee to perform actual services"); Sproles v. Binford, 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167 (1932) (provision of Texas Motor Vehicle Act held constitutional despite section allowing greater length and weight specifications for vehicles transporting materials from the point of origin "to the nearest practicable common carrier receiving or loading point or from a common carrier unloading point by way of the shortest practicable route to destination")
 
 
 [1]
 I join parts II and III of the majority opinion which hold that a possessory interest in the defendant currency is sufficient to establish standing to challenge forfeiture and that knowledge of the currency transportation reporting requirement is not an element of the violation. I dissent from the holding in parts IV and V of the majority opinion
 
 
 [2]
 Meixner was later charged with making a false statement to a federal officer under 18 U.S.C. Sec. 1001. She plead guilty and was sentenced to three years imprisonment. She moved to withdraw her guilty plea but the motion was denied. The conviction was affirmed on appeal to this court. The fact that Meixner made false statements to the CPOs is simply not probative as to whether she violated the currency transportation reporting requirement which does not come into operation under the applicable regulation until an individual has reached "the time of departure" from the country
 
 
 [3]
 Neither the parties nor the record explain the discrepancy between the amount of currency seized ($121,433) and the amount listed in the case caption ($122,043)
 
 
 [4]
 This is a case of first impression in this circuit. Although we have reviewed cases involving both criminal penalties and civil forfeitures for violation of the currency reporting requirement, the issue of whether currency had, in fact, been transported or the "time of departure" reached has not been addressed. For example, the case of United States v. Des Jardins, 747 F.2d 499 (9th Cir.1984), modified by order on other grounds, 772 F.2d 578 (9th Cir.1985), presented a similar fact situation, in that an individual was stopped on the jetway before boarding the aircraft. However, in reviewing her conviction for willful failure to report transportation of more than $5,000 in currency, this court limited its analysis to the constitutional permissibility of the search revealing the currency, whether a violation of the reporting requirement can be knowing and willful in the absence of actual denial in writing, and whether the reporting requirement infringed upon the privilege against self-incrimination. The Des Jardins court did not squarely confront the issue as to when the duty to file the report arises under the governing regulation
 
 
 [5]
 Cases involving entry into or departure from this country across an actual border must be distinguished. E.g., United States v. $47,980 in Canandian Currency, 726 F.2d 532, 534 (9th Cir.1984) (currency reporting requirement attached when claimant's agents presented themselves at a port of entry, on United States soil, despite eventual denial of entry). Presentation at a border station or arrival inside the United States at an international airport do not present fact situations in which the court must look for a point prior to crossing of the border at which the duty to file a currency report arises. The regulation's stark designation of "time of entry" or "time of departure" can be unambiguously applied in such a context. See 31 C.F.R. Sec. 103.25(b) (1983)
 Cases holding that government officials may constitutionally conduct border searches at points removed from the physical border are also inapposite. E.g., Almeida-Sanchez v. United States, 413 U.S. 266, 272-73, 93 S.Ct. 2535, 2539-40, 37 L.Ed.2d 596 (border searches may take place at "functional equivalents" of border, such as an established station near the border or at a domestic airport of arriving international flights); United States v. Alfonso, 759 F.2d 728, 734 (9th Cir.1985) (search of Columbia vessel in Los Angeles harbor within a day-and-a-half after arrival constituted an extended border search); United States v. Duncan, 693 F.2d 971, 977 (9th Cir.1982) (person stopped while proceeding up ramp to board international flight was at "functional equivalent of a border"; customs search may be made before a passenger boards aircraft), cert. denied, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). I do not suggest that the government is precluded from establishing a practical point as the functional equivalent of the border at which the duty to file a currency report would arise; rather I contend that they must in fact delineate such a point in the governing regulation. Furthermore, search and seizure cases involve application of the necessarily general prohibitions of the Fourth Amendment to governmental conduct in a particularized factual context. By contrast, the instant case involves the exacting of a penalty against private citizens for breaching an affirmative duty, without a clear delineation of when that duty arises.
 
 
 [6]
 This case was submitted for decision by the Fifth Circuit before the effective date of the court reorganization act establishing the Eleventh Circuit. See Pub.L. No. 96-452, Sec. 9(1), 94 Stat. 1995 (1980). The case was decided by a panel of the new Eleventh Circuit
 
 
 [7]
 I am also aware that Congress has recently adopted an amendment to section 5316, which may affect the result in future forfeiture cases brought under similar circumstances. The statute now requires an individual to file a report not only when knowingly transporting more than $10,000 in monetary instruments from the country, but also applies when a person "attempts" to transport that amount in currency from the country. Pub.L. No. 98-473, Sec. 901(c), 98 Stat. 2135 (1984). The adoption of this "attempt" provision was directed at precisely the type of situation raised in the instant case where the effective point of departure is difficult to ascertain. See S.Rep. No. 98-225, 98th Cong., 2d Sess. 301, 302, reprinted in 1984 U.S.Code Cong. & Ad. News 3182, 3481
 This "attempt" provision may very well make it unnecessary to determine the exact moment at which the duty to file a currency transportation report arises, short of actually crossing an international border, as the issue will instead be the intent of the individual to depart the country without making the required report and the taking of a substantial overt step toward that end. See United States v. One 1980 Mercedes Benz 500 SE, 772 F.2d 602, 604-06 (9th Cir.1985) (with addition of statutory language subjecting vehicles to forfeiture when used in an "attempt" to export articles in violation of the law, exportation need not be imminent for forfeiture provision to apply). Since the "attempt" amendment was adopted after the instant case arose, we cannot consider it today.
 
 
 [8]
 The majority in its recitation of the factual background of this case makes much of the fact that announcements were made advising passengers of the currency reporting requirement, that notices of the requirement were posted on the wall, and that the CPOs orally informed Meixner of the need to file a report. However, neither the signs, the public announcements, nor the oral warnings advised Meixner of the specific time or place for the required completion and delivery of the reporting form -- other than upon leaving the country. This was the fatal flaw
 The failure of the customs service to advise Meixner concerning the precise point at which the reporting duty arose is hardly surprising. As the Secretary has adopted the narrow phrase -- "time of departure" -- in the regulation, the customs service had no authority to suggest an earlier time or place to constitute the functional equivalent of the border. The regulation simply cannot unambiguously be applied at any point prior to the actual crossing of an international border, or perhaps the actual departure of the airlplane directly enroute to the border.
 
 
 [9]
 The Supreme Court's decision in Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952), is eminently distinguishable. In that case, the Court upheld against a vagueness challenge a regulation making it a crime to transport hazardous materials "into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings." Id. at 338-39, 72 S.Ct. at 330
 The definiteness of each criminal or prohibitory statute or regulation must be evaluated independently in terms of the purpose of the prohibition, the type of conduct regulated, and the underlying circumstances. The dangerous conduct proscribed in Boyce was of such a nature that a fairly generalized description was necessary in adopting a regulation that could be applied flexibly to varying circumstances.
 By contrast, the currency reporting act narrowly focuses upon conduct involving international borders. Departure from a country is a matter susceptible of more precise definition. A border is a fixed, unvarying point; the crossing of it can easily be ascertained. For purposes of the currency reporting requirement, the Secretary of the Treasury had the authority to designate another specific site as the functional equivalent of the border. Having instead established a "time of departure" standard, the government may not claim that the requirement unambiguously attaches at an earlier point.
 Moreover, it may well be that a higher degree of definiteness should be required before exacting a penalty against a private citizen for an act of omission, i.e., failing to perform an affirmative duty, than is required in proscribing such plainly dangerous and unreasonable conduct as that involved in the Boyce Motor Lines case.
 Finally, the Boyce Court emphasized that the statute regulating dangerous conduct in that case "punishes only those who knowingly violate the Regulation. This requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid." Id. at 342 (emphasis added) (footnote omitted).
 Yet this court today upholds a sanction against a private individual based upon violation of an ambiguous regulation, where knowledge of the currency reporting requirement is not an element of the offense. Thus the court is adopting a rule that could permit the imposition of sanctions against persons who fail to obey an indefinite requirement of which they may not even be aware. I regard such an interpretation of the currency reporting requirement to be so fundamentally unfair that it rises to the level of a due process violation.